"Y" PROPANE SERVICE, INC., Appellant,

v.

Maria GARCIA, Individually and as Representative of the Estate of Francisco Garcia, Deceased, Rogelio Garcia, Ubaldo Garcia, Francisco Garcia, Jr., and Maribel Garcia, Appellees.

No. 04–99–00880–CV.

Court of Appeals of Texas, San Antonio.

Aug. 15, 2001.

Ana Lisa Garza, Ramirez & Garza, L.L.P., Rio Grande City, Christiana Dijkman, Phillips & Akers, P.C., Houston, Steve Selby, Anna M. Baker, Douglas W. Alexander, Scott, Douglass & McConnico, Austin, for Appellant.

Augustin Rivera, Jr., Darrell L. Barger, Barger, Hermansen, McKibben & Villarreal, Corpus Christi, Dean William Powers, Jr., The University of Texas School of Law, Austin, Mikal C. Watts, Watts & Heard, L.L.P., Craig M. Sico, Harris & Watts, P.C., Corpus Christi, Jennifer Bruch Hogan, Richard P. Hogan, Jr., Hogan Dubose & Townsend, L.L.P., Houston, Roger W. Hughes, William L. Pope, Adams & Graham, L.L.P., Harlingen, for Appellees.

Sitting: TOM RICKHOFF, ALMA L. LÓPEZ and SARAH B. DUNCAN, Justices.

Opinion by: SARAH B. DUNCAN, Justice.

After a jury found "Y" Propane responsible for a gas explosion that resulted in property damage and the death of Francisco Garcia, the trial court rendered judgment against "Y" Propane for an amount in excess of six million dollars. "Y" Propane appeals, contending the evidence is insufficient to support the jury's verdict and the trial court erred in denying its motion to equalize the peremptory challenges. We hold the evidence is legally sufficient, but the trial court erred in denying "Y" Propane's motion to equalize. We therefore reverse the trial court's judgment and remand the cause for a new trial.

### FACTUAL AND PROCEDURAL BACKGROUND

In late 1996, Amando Peña, Sr. suggested that one of his employees, Francisco Garcia, move with his family to the smaller of two houses located on Peña's Los Morenos Ranch in Starr County. Approximately one year after the move, on December 7, 1997, Garcia suffered fatal injuries when an accumulation of propane in the house exploded. Shortly after the explosion, Garcia's widow, Maria, and his children sued "Y" Propane for negligently causing Garcia's death.

The facts surrounding the explosion are not in substantial controversy. When Garcia and his friend, Lionel Miranda, walked into the house, they smelled a strong gas odor. Garcia noticed that the rubber supply hose to the propane stove had been damaged by mice or a rat, so he went outside to shut off the valve on the 150–gallon propane tank behind the house. When he returned, he opened the refrigerator to remove two soft drinks. Moments after the refrigerator cycled on, the propane exploded.

The parties' experts agreed that a leak in the rubber hose had caused a substantial accumulation of propane, which was ignited when the refrigerator motor cycled on. The experts further agreed the configuration of the Garcias' propane tank and supply lines on the day of the explosion violated Texas Railroad Commission regulations in several particulars. The tank was approximately four to five feet closer to the house than the regulations permitted; the exterior copper supply line was not buried, as the regulations required; and the interior supply line was an automotive rubber hose secured by a radiator clamp, not the flexible hose designed specifically for LP-gas use and required by the regulations.

The parties and their witnesses also agreed that supplying gas to a propane installation that violated the regulations constituted negligence. According to Peña, "only 'Y' Propane" had delivered propane to his propane tanks in Starr County. Thus, the dispute at trial focused upon whether "Y" Propane had delivered gas to the Garcias' propane installation when it was configured in violation of the regulations. On this issue, the evidence conflicted sharply.

According to Francisco Garcia's widow, Maria, and his son, Ubaldo, the same 150–gallon tank that was found behind their home on the day of the explosion had been at that location since they moved into the house. Ubaldo Garcia also testified the supply lines had always been as they appeared on the day of the explosion. The Garcias also called Rodolfo Ojeda to testify. Ojeda, who worked for Peña's wrecker service, stated that the gate at Los Morenos was kept locked; and, when no one else was available, he was called to let people in. Although he first testified he let the "Y" Propane driver in the Los Morenos gate only once, less than a year before the explosion, he later stated he let the "Y" Propane driver into Los Morenos twice. The visits were approximately one month apart. During the first visit, the driver said the larger tank at the big house was "no good" and refused to fill it. For that reason, Peña instructed Ojeda to find another tank. Ojeda found an empty tank at another of Peña's ranches and took it to Los Morenos. Ojeda left the tank by and intended it for use at the big house. But the tank was at the smaller house by the time the "Y" Propane driver made his second visit, a few months before the explosion. On that visit, he only partially filled the tank because, he told Ojeda, there was a small leak. Ojeda testified he signed the receipt for this delivery.

The Garcias' and Ojeda's testimony was squarely controverted by "Y" Propane's driver in Starr County, Jose Molina. According to Molina, he was called to Los Morenos on June 4, 1997 to fill a 150–gallon tank located near the big house. Ojeda opened the gate for him. Molina put seventy-five gallons in the tank by the big house. As he was leaving, a man came out of the smaller house and told Ojeda he also needed gas. The tank connected to the smaller house was a 250–gallon tank that was approximately fifteen to twenty feet away from the smaller house and licensed by La Grande. Molina found a loose knob on the tank and tightened it. He then checked the buried copper line running from the tank to the exterior wall of the house and the flexible metal hose running from the interior wall to the stove. When everything checked out, he put only twenty-five gallons in the tank because the man told him he was only going to be there a little while. The man then signed the delivery receipt. According to Molina, this was his only delivery to Los Morenos.

The record contains a receipt signed by Garcia and Molina for the delivery of 100 gallons of propane to Los Morenos on June 4, 1997. The record also contains thirteen other receipts for propane deliveries, all delivered by "Y" Propane or its predecessor to Amando Peña and his company, Beefmasters:

| Invoice Number | Date | # Gallons | Signatures |
| --- | --- | --- | --- |
| 14006 | 12/21/96 | 800 | Molina; Ojeda |
| 14293 | 01/16/97 | 700 | Molina; Rufio Sandoval |
| 5101 | 02/28/97 | 185 | Molina; Ojeda |
| 5110 | 03/03/97 | 575 | Molina; Rufio Sandoval |
| 50313 | 03/19/97 | 825 | [no signature];Ojeda |
| 8347 | 04/07/97 | 845 | Molina; Ojeda |
| 9887 | 05/16/97 | 700 | Molina; Rufio Sandoval |
| 10623 | 06/04/97 | 100 | Molina; Garcia |
| 11146 | 06/16/97 | 750 | "TA"; Rufio Sandoval |
| 10722 | 07/01/97 | 600 | Molina; Ojeda |
| 11574 | 07/30/97 | 850 | Molina; Ojeda |
| 13562 | 09/05/97 | 800 | Molina; Ojeda |
| 13082 | 10/22/97 | 845 | Molina; Rufio Sandoval |
| 15109 | 11/13/97 | 400 | Molina; Miguel Acurillo |

None of the receipts indicate the location or locations to which the propane was delivered.

According to Molina, he returned to Los Morenos shortly after the explosion to investigate. The tank that had been connected to the Garcias' home on the day of the explosion was not the tank Molina had filled on June 4; nor was this tank configured as the tank had been on June 4. Shortly after his return visit to Los Morenos, on January 14, 1998, Molina's employment was terminated. Although he initially stated his employment was terminated because "it was slow," he later agreed that he was terminated because he was "slacking off." At the time of his deposition, Molina was imprisoned on a drug charge.

"Y" Propane's expert witnesses, Eduardo Sanchez and Sammy Russo, agreed with Molina that the 150–gallon tank connected to the small house at the time of the explosion was not the tank to which Molina delivered twenty-five gallons of propane on June 4, 1997. These witnesses based their conclusions on Molina's testimony in part. They also relied on (1) Amando Peña's testimony that Los Morenos' previous owner had removed two tanks from Los Morenos Ranch several days before the explosion; and (2) the regulator found on the tank involved in the explosion was clean. In Sanchez's opinion, the condition of the regulator yielded only two possible explanations. Either the regulator had been protected from the elements or it was indicative of a new installation. However, Sanchez testified, the regulator could not have been protected from the elements because the configuration of the copper supply line precluded closing the cover over the regulator. Russo concurred. He also noted that it was impossible for the twenty-five gallons that Molina supplied in June 1997 to last until December 1997, given Maria Garcia's testimony that she used the stove three times a day.

The Garcias' expert witness, Michael J. Schulz, testified it was impossible to tell how many deliveries "Y" Propane made to Los Morenos or when the last delivery occurred, because the receipts did not indicate the location or locations to which propane was delivered. However, based on Ojeda's testimony, Schultz believed there were two deliveries—one on June 4 and another several months before the explosion. Based on this belief, as well as portions of other witnesses' testimony, Schultz believed Molina had delivered propane to the Garcias' tank when it was illegally configured and, as a result, "Y" Propane's negligence proximately caused Garcia's death.

The jury found "Y" Propane responsible for the explosion; and the trial court rendered judgment on the jury's verdict in favor of Peña for $50,246.58 and in favor of the Garcias for $6,233,849.31. "Y" Propane appeals, challenging the legal and factual sufficiency of the evidence, several of the trial court's evidentiary rulings, and its denial of "Y" Propane's motion to equalize the peremptory challenges.

## LEGAL SUFFICIENCY

"Y" Propane argues the evidence is legally insufficient to support the jury's findings. We disagree.

### Scope and Standard of Review

The parties agree that we must view the evidence in the light most favorable to the jury's verdict. But they disagree on what evidence we may consider; and they cite in support of their arguments two diverging lines of supreme court authority. The Garcias cite the line of cases exemplified by *Garza v. Alviar*, 395 S.W.2d 821 (Tex.

1965), in which the court stated: "In deciding that [legal sufficiency] question, the appellate court must consider only the evidence and the inferences tending to support the finding and disregard all evidence and inferences to the contrary." *Id.* at 823. "Y" Propane, on the other hand, cites the line of cases represented by *Harbin v. Seale,* 461 S.W.2d 591 (Tex.1970), in which the court stated: "In making this ['no evidence'] determination, all evidence must be considered in a light most favorable to the party in whose favor the verdict has been rendered, and every reasonable inference deducible from the evidence is to be indulged in such party's favor." *Id.* at 592.

 We believe the scope of legal sufficiency review is dependent upon the context in which review is conducted. Thus, if the issue is whether the record contains any competent evidence of the vital fact, the entire record must be reviewed. *See* Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 Tex. L.Rev. 361, 363 (1960) (citing *Aetna Ins. Co. v. Klein,* 160 Tex. 61, 325 S.W.2d 376 (1959) (reviewing record evidence to determine whether there was competent evidence of insurance contract)). Similarly, when the issue is whether the evidence conclusively establishes the opposite of the vital fact, the scope of review must logically be the entire record. *See Provident American Ins. Co. v. Castaneda,* 988 S.W.2d 189, 206 (1998) (Gonzalez, J., dissenting, joined by Spector, J.) ("obviously it is impossible to conclusively establish the opposite of a vital fact without considering evidence contrary to the verdict"). But if the issue is whether there is more than a scintilla of evidence to support a jury finding, the court must disregard the evidence and inferences contrary to the verdict or judgment. *See* Calvert, 38 Tex. L.Rev. at 364 Thus, the "disregard-contrary-evidence" scope of review applies if

there is no direct evidence of the vital fact so that it must be inferred from circumstantial evidence. *See id.* Even in this situation, however, "undisputed evidence that allows of only one logical inference" is not disregarded. *Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 51 n. 1 (Tex.1997); *see id.* at 73–74 (Hecht, J., concurring in judgment, joined by Phillips, C.J., and Gonzalez & Owen, JJ.).

### *Discussion*

The undisputed evidence establishes that the Garcias' propane installation violated numerous regulations on the day of the explosion. Therefore, the "vital fact" to be proved was that the illegal propane installation existed at a time when "Y" Propane delivered propane to the Garcias' tank. The Garcias urge that this vital fact may be inferred from Maria and Ubaldo Garcia's testimony that the propane installation on the date of the explosion was as it had existed since they moved into the house in late 1996; Peña's testimony that only "Y" Propane delivered propane to his propane installations; and "Y" Propane in fact delivered propane to Los Morenos on June 4, 1997. We agree the vital fact appears to be a reasonable inference when only the evidence supporting the verdict is considered. However, as "Y" Propane argues, we must test the reasonableness of this inference in light of the "undisputed evidence that allows of only one logical inference." *Giles,* 950 S.W.2d at 51 n. 1.

"Y" Propane first argues that it is physically impossible for gas supplied by "Y" Propane to have been involved in the December 7, 2001 explosion, because (1) "Y" Propane delivered propane to Los Morenos only once, on June 4, 1997; (2) at that time, "Y" Propane only delivered "some" gas, according to Ojeda, or twenty-five gallons of gas, according to Molina; (3) Maria Garcia used the propane stove to cook the

family meals three times a day; (4) just one burner, used two hours a day, would consume forty gallons of propane in a six-month period; and (5) there was sufficient gas left in the tank on December 7, 2001 to not only cause the explosion but also to continue leaking the day following the explosion.

We begin with "Y" Propane's assertion that the undisputed evidence, specifically Molina's and Ojeda's testimony, establishes that "Y" Propane delivered propane to a tank at Los Morenos only one time. We agree both men so testified. Molina testified he made only the one delivery to Los Morenos on June 4, 1997; and Ojeda testified that, while Molina came to Los Morenos twice, it was not until the second visit that "Y" Propane put "some" propane in the Garcias' tank. However, according to Ojeda, he signed the receipt for this delivery, which occurred a few months before the explosion. And it is undisputed that Garcia signed for the propane delivered on June 4, 1997. Thus, while Molina's and Ojeda's testimony establishes that Molina delivered propane to the tank connected to the Garcia's home only once when Ojeda was there, the June 4, 1997 receipt establishes "Y" Propane may have made another delivery when Garcia, but not Ojeda, was there. Of course, this inference conflicts with Molina's testimony. But conflicts such as this are for the jury to resolve.

"Y" Propane also argues that no receipt other than the June 4 receipt indicates a delivery to Los Morenos. This is true. All of the receipts, including the June 4 receipt for gas indisputably delivered to Los Morenos, show deliveries to "Amando Peña" and "B & M" (presumably Beefmasters). But the fact that no receipts other than the June 4 receipt shows a delivery to Los Morenos does not establish the June 4 delivery was the only delivery made to Los Morenos. Indeed, as suggested above, if Garcia signed for one delivery on June 4 and Ojeda signed for a subsequent delivery, the second delivery may have occurred on July 1, July 30, or September 5—all dates on which Ojeda signed delivery receipts.

"Y" Propane also makes much of the fact that all of the deliveries after June 4 were for amounts in excess of the total capacity of the 150–gallon and 250–gallon tanks at Los Morenos. However, as the Garcias note, the receipts do not show delivery locations; and it is possible that some portion of the propane delivered after June 4 was delivered to Los Morenos. There is yet another flaw in "Y" Propane's theory. The jury may have concluded Molina delivered the full 100 gallons reflected in the June 4 receipt to the Garcias' tank. If this occurred, it would have provided sufficient gas to fuel one burner, used two hours a day, for the full six-month period between the delivery on June 4 and the explosion on December 7, with approximately sixty gallons to spare.

In short, the undisputed evidence does not lead necessarily to the inference that "Y" Propane made only one delivery to Los Morenos and that delivery was of an insufficient quantity to fuel the explosion. Consequently, "Y" Propane's "physical impossibility" theory is not a sufficient basis upon which to reject the seemingly reasonable contrary inference emanating from Maria and Ubaldo Garcia's testimony.

"Y" Propane next argues the undisputed evidence necessarily leads to the conclusion that the tank behind the Garcias' home was not in that location until several days before the explosion. "Y" Propane bases this argument upon the pristine condition of the regulator and the testimony of Amando Peña that several days before the explosion the previous owner of Los Morenos Ranch removed two tanks from

the property, a large tank that was connected to the larger house and another tank that was connected to the swimming pool heater. However, while the condition of the regulator suggests a recent installation, it does not lead inexorably to the conclusion that the entire configuration of the propane tank was likewise recent. The jury might reasonably have inferred that only the regulator was replaced shortly before the explosion; and this occurred some time after "Y" Propane made its last delivery to the Garcias' tank. Similarly, the possibility of a third tank at Los Morenos does not necessarily establish that it was installed after "Y" Propane's last delivery to the Garcias' tank. Indeed, Ojeda testified the tank he had brought over was installed shortly before "Y" Propane's last delivery.

■ We agree with "Y" Propane that the undisputed evidence is persuasive of its theory that the tank behind the Garcias' house on the day of the explosion was recently—and illegally—installed. However, this undisputed evidence does not *necessarily* establish that "Y" Propane did not deliver propane to the Garcias' tank in its illegal configuration. Thus, in light of Maria and Ubaldo Garcia's testimony, we conclude there is more than a scintilla of evidence supporting the jury's implied finding that "Y" Propane delivered propane to the Garcias' propane tank when it was illegally configured. We do so with reluctance, however. The evidence supporting the Garcias' case is extremely weak, troubled by inconsistencies, vagueness, and confusion. In another case, these evidentiary weaknesses might lead us to conclude the evidence is factually insufficient to support the jury's verdict. But we need not do so here. An independent ground requires reversal, as discussed below.

## PEREMPTORY STRIKES

"Y" Propane also contends the trial court erred in denying its motion to equalize the number of strikes and instead allocating six strikes to the Garcias, four to Peña and six to "Y" Propane. We agree.

### Factual and Procedural Background

After the Garcias filed suit, "Y" Propane filed a third-party action for contribution against Amando Peña and Amando Peña Beefmasters. Peña and Beefmasters answered and counterclaimed for the property damage sustained as result of the explosion. Before voir dire commenced, Peña's attorney informed the trial judge they would "need to discuss how the Court's going to allocate the strikes." Peña's counsel suggested that, because "Y" Propane had sued Peña, the court should allocate six peremptory challenges to the Garcias, three to Peña, and three to "Y" Propane. "Y" Propane's counsel, on the other hand, stated that if any party were to get six peremptory challenges, it should be "Y" Propane. The Garcias' counsel disagreed, stating that the Garcias should get as many strikes as were allocated to both Peña and "Y" Propane, because only the Garcias wanted an affirmative liability finding. The trial court deferred a ruling and instructed the attorneys to begin voir dire.

During general voir dire, the Garcias' attorney introduced the members of the Garcia family who were in attendance and then introduced Peña's attorney, noting that Peña's attorney was "not with [the Garcias'] part of the case" but was sitting at the Garcias' table "because there appears not to be a whole lot of room at the other table." The Garcias' attorney then introduced "Y" Propane's attorneys. Later, the Garcias' attorney stated: "[Peña's attorney] is a very fine lawyer who has a great reputation and tries a lot of cases.

Has anybody ever seen him or knows him?" The Garcias' attorney did not otherwise mention or inquire of the venire about Peña.

During its general voir dire, "Y" Propane's attorney questioned the panel extensively regarding their knowledge of and relationships with Peña, members of his family, and his business interests. Several venire persons stated they knew Peña or members of his family, had worked for one or another of his business interests, knew Peña was a former county commissioner, and knew his son Fernando Peña, who was, at the time of trial, mayor. One venire person was Fernando Peña's secretary.

During his general voir dire, Peña's attorney emphasized that the Garcias had not sued Peña; and "Y" Propane was responsible for the Garcias' losses:

> I represent Mr. Peña. Some of you know him. He wasn't sued by the Garcias. He wasn't sued by these lawyers. Nobody ever claimed he did anything wrong. That company, "Y" Propane, got sued and they decided [to] sue Mr. [Peña] because they don't want to pay what they owe to this family. They want Mr. Peña to pay it. That's what they claim. . . . That's why Mr. Peña is here. The folks who lost their husband, lost their father, their lawyers looked at this case and decided Mr. Peña had nothing to do with it.
>
> . . . .
>
> It's in this case, [the] Garcia family, sued "Y" Propane, saying they did something wrong. And they are going to come in and prove to you that they . . . caused this. They did not sue Mr. Peña. By the way, Mr. Peña, he owned the house and it was on the ranch and he was letting the Garcia family [sic] that Mr. Peña knows nothing about these events,

was not over there. Has nothing to do with the propane system.

> Now, he doesn't put propane in those tanks those folks put propane in those. Now, Mr. Peña, of course, was not sued by the Garcia family, was not sued by these lawyers, but he gets sued by "Y" Propane, by Ms. Dijkman through "Y" Propane. She has the burden of proof to come in here and prove to you Mr. Peña did something to cause this horrible fire. And I want you [to] hold her to that burden of proof because Mr. Peña did nothing, period, that caused this horrible tragic fire.
>
> . . . .
>
> Give me a couple more minutes I am going to sit down. You are not going to hear a lot from me from the trial because to be honest with you, this fight is really between the Garcia family and "Y" Propane.
>
> . . . .
>
> All right. One last question. Is there anybody here who can't give the parties a fair trial for any reason? Okay? Does everybody understand that Mr. Peña was not sued by the family that suffered this tragic loss? It was by the people who did cause the problem. Does everybody understand that? Okay.

After the parties' general voir dire, the court recessed for lunch. When they returned, "Y" Propane non-suited its claims against Peña and Beefmasters without prejudice. In response, Peña's attorney argued the nonsuit should be with prejudice but that, as a matter of law, the nonsuit was with prejudice because "[t]he Civil Remedies Code requires that claim to be conducted in this case." "Y" Propane's attorney countered that she believed she could still file a contribution suit against Peña after the Garcias' suit was concluded; but whether the nonsuit was with prejudice "is something that would be taken up

if and when I chose [sic] to bring a suit against Mr. Peña. But it doesn't affect the situation here today. My request is for a nonsuit without prejudice. And I think that's something that if [Peña's attorney] wants to argue, that it's automatically with prejudice because of what's stated in the Civil Practice and Remedies Code. That's something that comes up later because frankly, if I never sue Mr. Peña, then the issue is moot." The Garcias' attorney then pointed out "that under the Civil Practices and Remedies Code, it changed in '95. If you are going to bring contribution and indemnity it's got to be in the main action. But it's still your call." "Y" Propane's attorney responded, "Maybe that's our risk." "Y" Propane's attorney then stated:

> I think that changes the situation. We now have "Y" Propane on one side, we have Amando Peña and the Garcias on one side. I think we got to do something about equalizing strikes in that regard. It should be equal in both sides of the line since the antagonism has changed.

"Y" Propane also noted on the record that Peña had testified in the first trial that he was friends with the Garcia family and he was sitting with them in the jury box during voir dire at the second trial.

At the conclusion of voir dire, "Y" Propane moved to equalize the number of peremptory strikes—three strikes for the Garcias, three strikes for Peña/Beefmasters and six for "Y" Propane—because both the Garcias and Peña were pursuing claims against "Y" Propane and they were not antagonistic with respect to any issue to be submitted to the jury. In response, the Garcias and Peña contended they were antagonistic as to the Garcias' damages because "Y" Propane's nonsuit was without prejudice; it thus retained the right to file an independent contribution suit against Peña in the future. "Y" Propane coun-

tered that whether its contribution claim could be pursued at a later date was "irrelevant." The trial court denied "Y" Propane's motion to equalize and awarded six peremptory strikes to the Garcias, four to Peña/Beefmasters, and six to "Y" Propane.

### Applicable Law

■ As a general rule, each party to a civil case in district court is entitled to six peremptory strikes. Tex.R. Civ. P. 233. However, in a multiparty case, the trial court must (1) first "decide whether any of the litigants aligned on the same side of the docket are antagonistic with respect to any issued [sic] to be submitted to the jury," and (2) then, upon timely motion, "equalize the number of peremptory challenges so that no litigant or side is given unfair advantage as a result of the alignment of the litigants and the award of peremptory challenges to each litigant or side." *Id.*

■ "If no antagonism exists, each side must receive the same number of strikes." *Garcia v. Central Power & Light Co.*, 704 S.W.2d 734, 736 (Tex.1986). For this purpose, "side" "is not synonymous with 'party,' 'litigant,' or 'person.' Rather, 'side' means one or more litigants who have common interests on the matters with which the jury is concerned." Tex.R. Civ. P. 233. Thus, "[t]hough their interests need not be completely identical, litigants on the same side of the docket are deemed to be a 'party' under the rule when their interests are not antagonistic in a matter in which the jury is to be concerned." *Patterson Dental Co. v. Dunn*, 592 S.W.2d 914, 917 (Tex.1979). If the trial court errs in the allocation of peremptory challenges, reversal is required if the complaining party demonstrates either that the trial was materially unfair or that the trial was hotly contested and the evidence sharply conflicting. *See id.* at 920–21.

### Scope and Standard of Review

■ "The existence of antagonism is a question of law." *Garcia,* 704 S.W.2d at 736. We review questions of law de novo. *See El Paso Natural Gas Co. v. Minco Oil & Gas, Inc.,* 8 S.W.3d 309, 312 (Tex.1999). Thus, like the trial court, we "must consider the pleadings, information disclosed by pretrial discovery, and other information brought to the attention of the trial court." *Dunn,* 592 S.W.2d at 919.

### Discussion

■ By the time "Y" Propane moved to equalize, the operative pleadings established there was no antagonism between the Garcias and Peña as to any issue that would be submitted to the jury in the primary suit. Both the Garcias and Peña sought to establish "Y" Propane's sole liability for the explosion; and "Y" Propane no longer sought contribution from Peña. However, because "Y" Propane non-suited its contribution claim against Peña without prejudice, "Y" Propane retained the right to assert the claim in an independent suit filed after its liability was established in a judgment rendered in favor of the Garcias. *See Ingersoll–Rand Co. v. Valero Energy Corp.,* 997 S.W.2d 203, 208 (Tex.1999).[1] Therefore, the narrow issue before us is whether the antagonism that would exist in a possible, future contribution suit is sufficient to establish antagonism in the primary suit. We hold it is not. *Cf. Turner v. Turner,* 385 S.W.2d 230, 238 (Tex.1964) (that two defendants might have actions against each other as to the extent of their own liability does not entitle each to six peremptory challenges); *Parker v. Associated*

*Indem. Co.,* 715 S.W.2d 398, 401 (Tex. App.—San Antonio 1986, writ ref'd n.r.e.) ("We conclude the parties defendant were not antagonistic to each other in the suit, nor, most importantly, had they demonstrated antagonism *prior to the selection of the jury.*").

■ Anticipating our holding, the Garcias and Peña argue the error was invited. We disagree. The invited error doctrine only applies when a party "ask[s] something of the trial court and then complain[s] on appeal the trial court gave it to him." *Daniels v. Pecan Valley Ranch, Inc.,* 831 S.W.2d 372, 382 (Tex.App.—San Antonio 1992, writ denied), *cert. denied,* 508 U.S. 965, 113 S.Ct. 2944, 124 L.Ed.2d 692 (1993). That is not the situation here. "Y" Propane never asked the trial court to grant an unequal number of peremptory challenges.

■ We hold the trial court erred in denying "Y" Propane's motion to equalize the peremptory challenges. We further hold this error was reversible. As is evident from our sufficiency analysis above, "Y" Propane's liability for the explosion was hotly contested, and the liability evidence was sharply conflicting. We therefore hold the error is reversible.

### CONCLUSION

Because the trial court erred in denying "Y" Propane's motion to equalize the peremptory challenges, we reverse its judgment without reaching "Y" Propane's remaining issues and remand the cause for a new trial.

Concurring opinion by: ALMA L. LÓPEZ, Justice.

With regard to the issue involving the equalization of peremptory strikes, the ma-

---

**1.** "In a suit for either contribution or indemnity the injury upon which suit might be based does not arise until some liability is established. In this case, as in a contribution claim against a joint tortfeasor, liability could not have been established until judgment was rendered." *Ingersoll–Rand,* 997 S.W.2d at 208.

jority frames the issue as "whether the antagonism that would exist in a possible, future contribution suit is sufficient to establish antagonism in the primary suit." The majority holds that it is not. Although I concur in the conclusion reached by the majority, I write separately to explain my reasoning.

"The threshold question to be answered in allocating strikes when multiple litigants are involved on one side of a lawsuit is whether any of those litigants on the same side are antagonistic *with respect to a question that the jury will decide." Patterson Dental Co. v. Dunn,* 592 S.W.2d 914, 918 (Tex.1979). "[L]itigants on the same side of the docket are deemed to be a 'party' under the rule when their interests are not antagonistic *in a matter in which the jury is to be concerned." Id.* at 917. "The antagonism must exist on an issue of fact *that will be submitted to the jury." Id.* at 918.

In this case, the only liability issue to be submitted to the jury was whether "Y" Propane and/or Francisco's negligence proximately caused Francisco's injuries and the percentage of negligence attributable to each. The Garcias and Peña were not antagonistic regarding this issue. The jury in this case was not concerned with any right of contribution "Y" Propane may have against Peña. Therefore, the contribution issue was not a "matter in which the jury [was] to be concerned." *Id.* at 917. Since the Garcias and Peña were not antagonistic with regard to the issue to be submitted and decided by the jury, the Garcias and Peña, as one side, should have received the same number of strikes as "Y" Propane. *Id.* at 918.