**Scott Michael POJAR, Appellant,**

v.

**Wendell and Neida CIFRE, as Next Friends of Beatrice Cifre, formerly a Minor Child, Appellees.**

No. 13–03–234–CV.

Court of Appeals of Texas, Corpus Christi–Edinburg.

Feb. 23, 2006.

Christopher Dove, Locke, Liddell & Sapp, S. Shawn Stephens, Baker & Hostetler, Houston, for appellant.

Maria Teresa Arguindegui, Law Office of Maria Teresa Arguindegui, Alice Oliver–Parrott, Burrow & Parrott, LLP, Jimmy Williamson, Williamson & Sears, Houston, for Appellees.

Before Justices HINOJOSA, YAÑEZ, and GARZA.

## OPINION

Opinion by Justice GARZA.

In this personal-injury case arising from a two-vehicle collision, the Court addresses five main issues: (1) Did the trial court abuse its discretion by giving six peremptory challenges to the plaintiff and only three to each of two antagonistic co-defendants? (2) Is any issue regarding the admission of evidence of marijuana use properly before this Court? (3) Does sufficient evidence support an award for loss of past services if there is no evidence of lost services? (4) Must a trial court disregard a jury's finding of malice as immaterial if the jury does not award exemplary damages? (5) Is evidence that a person used marijuana prior to operating a motor vehicle on a public road and entering an intersection despite a red light, thereby causing a collision with another vehicle, legally or factually insufficient to prove malice if the same person admits that driving under the influence of marijuana is wrong because it is dangerous?

We answer all these questions in the negative. Accordingly, the judgment of the trial court is reversed and rendered in part and affirmed in part. See TEX.R.APP. P. 43.2(a), (c). Specifically, the portion of the judgment awarding $200,000 for loss of past services is reversed and a judgment is rendered awarding zero damages for loss of past services. The judgment is otherwise affirmed.

## I. Background

The following facts are undisputed. This case arises from a two-car collision that occurred at the intersection of two farm-to-market roads in Galveston County. The accident occurred just before 2:00 a.m. on the morning of Sunday, December 12, 1999. The occupants of the vehicles were all teenagers.

Scott Michael Pojar was driving one of the cars, which had a total of four occupants. Two of the occupants, Amanda Schaub and Jamie McCaughey, were relatively unharmed by the accident. The other two occupants were seriously hurt.

Scott Pojar was trapped in his vehicle and had to be rescued by the "Jaws of Life." He suffered a lacerated liver and a broken jaw and shoulder. He was taken to the hospital via "Life Flight" helicopter. The damage to Scott Pojar's jaw changed his appearance and prevents him from opening his mouth widely, but he has otherwise recovered.

Beatrice Cifre, the fourth occupant of Scott Pojar's vehicle, was instantly paralyzed during the collision. She was also taken to the hospital via Life Flight helicopter. At trial, there was extensive, undisputed evidence of the serious physical, emotional, and financial difficulties that now face Beatrice Cifre and her family. She is permanently paralyzed from the

waist down and requires a great deal of care.

Laura Kathleen McCormick was the driver of the second car. She had no passengers in her vehicle, and she escaped the collision with only minor injuries.

Other than the teenagers involved in the accident, the only eyewitness was Charles McCullough. He was traveling in the same direction on the same road as McCormick. McCullough testified that McCormick passed his vehicle and subsequently collided with the vehicle driven by Scott Pojar.

As next friend of Beatrice Cifre, a minor, Wendell Cifre and Neida Cifre sued Scott Pojar, Brenda Pojar (Scott's mother), and Laura McCormick for damages sustained as a result of the accident. The defendants filed cross-claims against each other, alleging that the other driver was the sole cause of the accident. The case was tried to a jury, and the parties presented conflicting evidence about who had the green light at the intersection. Each driver claimed that the other had caused the accident by running a red light. The jury also heard testimony that Scott Pojar and several of his friends had been smoking marijuana before the accident. There was evidence that some of the teenagers, though not Scott Pojar, had also been drinking alcohol. On direct examination by her attorney, Brenda Pojar admitted that she knew Scott Pojar had used marijuana in the past and had broken his promise to stop using it. For his part, Scott Pojar testified that he did not use any marijuana on the night of the accident, though he admitted using marijuana in the past, admitted that he had driven his car after using marijuana in the past, and also admitted that he had a marijuana-related sticker on his car. Testimony from other witnesses was also presented to corroborate Scott Pojar's version of events.

An instructed verdict was granted in favor of Brenda Pojar on the sole claim against her, which was for negligent entrustment. The jury found that Scott Pojar's negligence caused the accident and awarded compensatory damages to Wendell and Neida Cifre and separate compensatory damages to Beatrice Cifre. The jury further found that the harm to Beatrice Cifre resulted from malice, but it did not assess any exemplary damages against Scott Pojar. The trial court entered a judgment on the verdict, and this appeal by Scott Pojar ensued.

## II. Allocation of Peremptory Challenges

Scott Pojar's first issue challenges the trial court's allocation of peremptory challenges: six were given to Wendell, Neida, and Beatrice Cifre; three were given to Scott and Brenda Pojar; and three were given to Laura McCormick. The trial court instructed the parties that only counsel for the defendants could work together in exercising the challenges. On appeal, no suggestion has been made that this instruction was violated. As discussed below, we find no abuse of discretion in the trial court's allocation of challenges.

■ We believe it is important, at the outset, to acknowledge the serious consequences of error related to the allocation of peremptory challenges. Under current case law, such error will usually lead to reversal of the judgment and remand for new trial. *See, e.g., Garcia v. Cent. Power & Light Co.,* 704 S.W.2d 734, 737 (Tex. 1986) ("When the trial is hotly contested and the evidence sharply conflicting, the error results in a materially unfair trial without showing more."). But this was not always so. At one point in time, such errors were very rarely grounds for reversal. *See Tamburello v. Welch,* 392 S.W.2d

114, 116 (Tex.1965) ("Even before the adoption of the Rules of Civil Procedure, a refusal to allow the proper number of peremptory challenges was [often] regarded as immaterial...."). Later, errors in the allocation of peremptory challenges became more common, though still somewhat difficult, bases for new trial. *See Patterson Dental Co. v. Dunn,* 592 S.W.2d 914, 920–21 (Tex.1979) (noting that the traditional harmless-error rule had been relaxed as to error regarding peremptory challenges). Presently, a finding of such error spells certain doom for the judgment on appeal.[1]

Although the law thus appears to have changed over the years, at least one thing has remained constant: the elimination of any unfair advantage is one of the most fundamental tenets guiding the trial courts in allocating peremptory challenges. *See* Tex.R. Civ. P. 233. What has changed, and what we must continually grapple with as an appellate court, is what actually amounts to an unfair advantage in the allocation of peremptory challenges and what degree of harm must be shown to justify a new trial. *See id.;* Tex.R.App. P. 44.1(a). In explaining today's decision, we emphasize that, regardless of what degree of harm must be shown to justify a new trial, the complaining party must always bear the initial burden of showing actual error. Considerations of fairness remain an integral part of today's jurisprudence, and we decide today's case by considering whether the trial court's allocation of peremptory challenges produced an unfair advantage, an approach which is consistent with supreme court precedent. Because we find no abuse of discretion, we do not reach any issues of harm.

### A. Controlling Authority

We begin with an overview of controlling authority. The starting point

of our analysis is rule 233: "Each party to a civil action is entitled to six peremptory challenges in a civil case tried in district court...." Tex.R. Civ. P. 233. The number of challenges may be different if a lawsuit involves multiple litigants on the same side of the docket. *Garcia,* 704 S.W.2d at 736. In such cases, the trial court must determine whether any of the litigants on the same side of the docket are antagonistic with respect to an issue of fact that the jury will decide. Tex.R. Civ. P. 233; *Garcia,* 704 S.W.2d at 736. If no antagonism exists, each side must receive the same number of challenges. *Garcia,* 704 S.W.2d at 736. This means, for instance, that if the total number of challenges were 12, six would go to the plaintiffs' side and six would go to the defendants' side. *See id.* In contrast, if the trial court determines that antagonism exists, it has discretion, "upon motion of any litigant made prior to the exercise of peremptory challenges," to "equalize" the number of challenges "so that no litigant or side is given an unfair advantage as a result of the alignment of the litigants and the award of peremptory challenges to each litigant or side." Tex.R. Civ. P. 233.

On appeal, the reviewing court must first conduct a de novo review to determine whether any antagonism existed between any litigants on the same side of the docket on an issue to be decided by the jury. *See Dunn,* 592 S.W.2d at 919. If so, the reviewing court considers whether the trial court's allocation of peremptory challenges created an unfair advantage that amounted to an abuse of discretion. *Id.* at 919–20. Finally, if and only if there was antagonism between litigants on the same side of the docket and an unfair advantage created by the allocation of peremptory

---

1. See cases cited in footnote 5.

challenges, the reviewing court must decide whether the trial was materially unfair by determining whether the case was hotly contested and the evidence sharply conflicting. *See id.* at 921.

## B. Antagonism

Rule 233 burdens the trial court with the duty to decide whether any of the litigants aligned on the same side of the docket are antagonistic with respect to any issue to be submitted to the jury. TEX.R. CIV. P. 233. In this case, there were three plaintiffs: Wendell, Neida, and Beatrice Cifre. The suit was originally filed by Wendell and Neida Cifre as next friends of Beatrice Cifre, who was then a minor. By the time of trial, Beatrice Cifre was no longer a minor and she became a plaintiff in her own capacity. Her parents remained plaintiffs in the suit, seeking to recover damages that they sustained as a result of the accident.

There were also three defendants in the case: Laura McCormick and Scott and Brenda Pojar. As noted above, the claim against Brenda Pojar was ultimately dismissed by way of instructed verdict. This left the jury to determine the liability of Laura McCormick and Scott Pojar.

At trial and on appeal, the parties have argued the peremptory challenge issue as though there were only three litigants in this case: Beatrice Cifre, as sole plaintiff, and Laura McCormick and Scott Pojar, as co-defendants. To be consistent with the parties' treatment of the case, we will decide Pojar's issue as he has presented it: Beatrice Cifre and her parents (collectively "Cifre") will be treated as one plaintiff, Scott Pojar and Brenda Pojar (collectively "Pojar") will be treated as one defendant,

and Laura McCormick will be treated as Pojar's co-defendant.[2]

Because there were multiple litigants on the same side of the docket, the trial court had the duty to decide whether any antagonism existed between them. *See id.* Before trial, counsel for Pojar pointed out that Cifre was much more hostile toward Pojar than McCormick. Pojar's attorney asked that Cifre and McCormick be treated as the same side for the purposes of picking a jury. The trial court denied this request, but it took notice on the record that the attorneys for Cifre and McCormick were "acting chummy." Inherent in this statement is an acknowledgment that Pojar and McCormick were, to some degree, antagonistic toward one another.

Notably, antagonism is the central issue discussed in the dissenting opinion. We have no quarrel with the dissent's conclusion that antagonism existed between Pojar and McCormick, nor is there any reason to bicker over the extent to which this antagonism manifested itself prior to the exercise of peremptory challenges. Our concern is with how the trial court is expected to remedy such antagonism and, more particularly, with whether the trial court got it wrong in this case.

## C. Issue Preservation

Pojar did not request equalization of peremptory challenges at trial, though his attorney did file a "Motion for Equalization of Peremptory Strikes." In Texas, motions are judged by their substance rather than their titles. *City of McAllen v. Ramirez*, 875 S.W.2d 702, 705 (Tex. App.-Corpus Christi 1994, orig. proceeding). In substance, Pojar's motion asked that Cifre and McCormick be considered as the same side for the purpose of picking

---

**2.** The parties to this appeal seem to agree that there was no antagonism between Wendell, Neida, and Beatrice Cifre. There is also no

indication that any antagonism existed between Scott and Brenda Pojar.

a jury. Pojar wanted either six or eight peremptory challenges for himself and an equal number to be split between Cifre and McCormick.

The substance of Pojar's request is clear from counsel's arguments to the trial court:

The Court: Okay. But what I am asking you is [whether] there [is] a case that ever put the defendants with the plaintiffs where there wasn't some kind of written agreement?

Counsel for Pojar: Yes, Your Honor. *D.B. Counsel versus Banger Life Insurance* [sic]; *Diamond Shamrock versus Went* [sic]; *Williams versus Texas City Refinery.*

* * *

The Court: I will take judicial notice that they [referring to counsel for Cifre and counsel for McCormick] are acting chummy, but I don't think that gets us there. I don't think that's the law.

Counsel for Pojar: I think the most apropos case is the *Diamond Shamrock* case.

The Court: They gave the plaintiff 12, chummy defendant six, said they were aligning them on the same side and gave the defendant out there by himself six.

Counsel for Cifre: I haven't seen the case, Judge.

The Court: I will let you have it. I love these cases that don't tell you what you should do.

* * *

The Court: So, what is it that you all are asking for here?

Counsel for Pojar: Just the same amount of strikes they get. If we get six strikes, they get four and two, five and one, three and three. Or eight each side, four, four, and eight. Just

some kind of equalization so we have a fair right to form the jury, the same right you have.

The Court: I will deny your request and give the plaintiff six, you three apiece, and if you want to work together that's fine. But ... [counsel for McCormick is] not to work with [counsel for] the plaintiffs on the strikes.

From the foregoing exchange, it is clear that, although counsel used the term "equalization," what he actually sought from the trial court was "the same amount of strikes they get," meaning the combined number given to Cifre and McCormick. The substance of this request is also apparent from Pojar's motion for equalization, which sought "the same amount of strikes they get."

Although counsel used the word "equalization" in making his request, he sought relief other than equalization. The supreme court has explained that equalization may be accomplished by increasing the number of challenges allotted a sole litigant on one side, by decreasing the number allotted the multiple litigants on the other side, or by both. *See Dunn,* 592 S.W.2d at 920. Pojar did not ask for such relief. He asked the court to change the alignment of sides. Pojar wanted Cifre and McCormick, a plaintiff and a defendant, to be treated as the same side, leaving Pojar as the sole litigant on the other side.

Our Court has recognized this type of relief as "realignment of sides" and has discussed it as relief that is separate and distinct from equalization of challenges. *See Diamond Shamrock Corp. v. Wendt,* 718 S.W.2d 766, 769 (Tex.App.-Corpus Christi 1986, writ ref'd n.r.e.) ("The number of peremptory challenges allotted to each litigant presents a different prob-

lem.").[3] We have also recognized that any error in the trial court's allocation of peremptory challenges must be preserved by a timely, specific objection. *Tex. Commerce Bank Reagan v. Lebco Constructors,* 865 S.W.2d 68, 78 (Tex.App.-Corpus Christi 1993, writ denied).

Pojar raises a different issue on appeal than what was argued at trial. Pojar contends that the trial court erred in denying his motion "to alter the usual allocation of peremptory strikes," but Pojar actually requested that the trial court change the alignment of sides rather than equalize the challenges. The trial court recognized this distinction and asked counsel for Pojar to produce appellate authority allowing it "to put [one of] the defendants with the plaintiffs where there wasn't some kind of written agreement." Rather than clarifying any misunderstanding by specifying that what he actually wanted was equalization rather than realignment, counsel immediately responded with case law to support his request to align Cifre and McCormick as a single side, citing, among other things, this Court's opinion in *Wendt. See Wendt,* 718 S.W.2d at 769. The trial court was unconvinced that realignment was appropriate and overruled Pojar's request.

Pojar now complains that the trial court erred by failing to equalize the challenges, even though a different request was made at trial. The discrepancy between Pojar's request at trial and Pojar's complaint on appeal prompts this Court to evaluate whether Pojar's first issue was preserved for appellate review.

■ In general, as a prerequisite to presenting a complaint for appellate review, the record must show that the trial court ruled or refused to rule on a timely request, objection, or motion that stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context. *See* Tex.R.App. P. 33.1(a). This rule has been generally understood to mean that, in most instances, an appellate complaint cannot be reviewed unless the same, specific complaint was first made to the trial court. *See San Antonio v. Schautteet,* 706 S.W.2d 103, 104 (Tex.1986); *McCain v. NME Hosps., Inc.,* 856 S.W.2d 751, 755 (Tex.App.-Dallas 1993, no writ). This rule applies to errors related to the allocation of peremptory challenges. *In the Interest of M.N.G.,* 147 S.W.3d 521, 532 (Tex.App.-Fort Worth 2004, pet. denied) ("[A]ny error in the trial court's allocation of jury strikes among the parties must be preserved by a timely objection.").

■ Even if there were merit to Pojar's first issue, it would be improper to reverse the judgment of the trial court on the basis of equalization, given that Pojar asked the court to realign the sides rather than to equalize the challenges. Nor would it be fair to conclude that a request for equalization was inherent in Pojar's request for realignment. Pojar requested that Cifre and McCormick be treated as a single side; he never asked the trial court to simply increase his number of peremptory challenges, which would have been a proper request for equalization. *See Dunn,* 592 S.W.2d at 920. The trial court should not be faulted for Pojar's failure to

---

**3.** Pojar's attorney relied on *Diamond Shamrock Corp. v. Wendt,* 718 S.W.2d 766, 769 (Tex.App.-Corpus Christi 1986, writ ref'd n.r.e.) several times in making arguments to the trial court. Appellate counsel for Pojar has also relied on the case. We are therefore confident that counsel understands the distinction between equalization of peremptory challenges and realignment of sides, as that distinction was emphasized in the *Wendt* opinion. *See id.*

clearly articulate the relief he sought. We have long required parties to raise requests "with sufficient specificity to make the trial court aware of the complaint [or relief sought]." TEX.R.APP. P. 33.1(a). The circumstances of this case present no occasion for departing from this basic procedural expectation, much less an occasion for finding an abuse of discretion in the trial court's ruling on the request actually made.

It should also not be forgotten that important prudential considerations underscore our rules on issue preservation. *In the Interest of B.L.D.,* 113 S.W.3d 340, 350 (Tex.2003). Requiring parties to raise complaints at trial conserves judicial resources by giving trial courts an opportunity to correct an error before an appeal proceeds. *Id.; In re C.O.S.,* 988 S.W.2d 760, 765 (Tex.1999). In addition, our preservation rules promote fairness among litigants. *B.L.D.,* 113 S.W.3d at 350. A party should not be permitted to waive, consent to, or neglect to complain about an error at trial and then surprise his opponent on appeal by stating his complaint for the first time. *Id.; Pirtle v. Gregory,* 629 S.W.2d 919, 920 (Tex.1982) (per curiam). Each of these prudential considerations is present in this case, and they collectively militate against Pojar's position.

### D. Realignment of Sides

■ To the extent Pojar's first issue challenges the trial court's failure to realign sides, we hold that no error has been shown. This Court addressed realignment of sides in *Wendt,* a case which also involved a single plaintiff on one side facing two defendants on the other. *Wendt,* 718 S.W.2d at 769. In *Wendt,* we noted that, although there had been no settlement between any of the parties, the degree of the plaintiff's antagonism toward one of the defendants was not the same as toward the other defendant. *Id.* Nevertheless, because the plaintiff was actively seeking recovery against both defendants, we held that the trial court did not err in failing to realign the plaintiff with the co-defendant facing the least antagonism from the plaintiff. *Id.*

The excerpt from the reporter's record included in the text above indicates that counsel for Pojar directed the trial court to *Wendt* and that our precedent was given due consideration. The record also reflects the trial court's conclusion that, in the absence of evidence that the litigants had ceased to be adversaries, such as a settlement agreement or the like, realignment of sides would be improper. This is an accurate application of the *Wendt* opinion, in which this Court specifically noted the absence of a settlement agreement and held that realignment would have therefore been improper, even though "the two defendants were obviously antagonistic to each other" and the interests of one of the defendants were "closely identified" with those of the plaintiff. *Id.* at 770.

The trial court's ruling in this case is also consistent with the other two opinions relied upon by Pojar in making his request for realignment. *See Williams v. Tex. City Refining, Inc.,* 617 S.W.2d 823, 826–27 (Tex.App.-Houston [14th Dist.] 1981, writ ref'd n.r.e.); *Council v. Bankers Commercial Life Ins. Co.,* 558 S.W.2d 487, 489 (Tex.App.-Beaumont 1977, writ ref'd n.r.e.).

In *Williams,* the trial court allotted seven peremptory challenges to the defendant, six to the plaintiff, and one to a third-party defendant, with whom the plaintiff had apparently reached a settlement agreement prior to trial. *Williams,* 617 S.W.2d at 826. On appeal, the plaintiff complained that the trial court erred in allocating peremptory challenges. *Id.*

Overruling this issue, the appellate court concluded that, given the agreement between the plaintiff and the third-party defendant that was announced to the court prior to the voir dire examination and in view of the antagonism existing between the defendant and the third-party defendant, there was no abuse of discretion in the allocation of the challenges. *Id.* at 826–27.

This case stands in contrast with *Williams* in that there was no similar agreement between Cifre and McCormick. This distinction was noted by the trial court, which correctly declined to realign the sides in the absence of such an agreement.

This case is also different than *Bankers Commercial*, a case in which the appellate court found reversible error because the plaintiff and one of the defendants had a "cozy relationship" that allowed the plaintiff to achieve an "unfair advantage" over the other defendants. *Bankers Commercial*, 558 S.W.2d at 489. In *Bankers Commercial*, the plaintiff brought an action for tortious interference with contractual relationships against three defendants, one of who, an individual named Scott, began collaborating with the plaintiff before trial. *Id.* at 487–88. Scott confessed that he had embezzled in excess of $450,000 from the plaintiff and agreed to make restitution insofar as he was capable of doing so. *See id.* at 488. Scott also agreed to cooperate with the plaintiff in the prosecution of its claims against the other defendants. *See id.* Scott further agreed to assert claims against his two co-defendants and to give any proceeds from the claims to the plaintiff. *See id.* Under these circumstances,

the appellate court found reversible error in the trial court's award of six peremptory challenges apiece to Scott and the plaintiff. *See id.* at 488–89. Such extreme circumstances were not present in the instant case.

There was therefore no error in the trial court's refusal to realign sides.

### E. Equalization of Peremptory Challenges

▮ In the interest of providing the parties with a full disposition of all issues raised on appeal, we find it appropriate to note that, even if any issue regarding equalization of peremptory challenges were preserved, Pojar would still not prevail on his first issue. *See* Tex.R.App. P. 33.1(a), 47.1. That is, even if the issue of equalization were properly before this Court, as the dissent concludes, we would hold that no abuse of discretion has been shown.

▮ Although the existence of antagonism has long been recognized as an issue of law subject to de novo review, a trial court's allocation of peremptory challenges in the face of antagonism, the so-called "equalization" of strikes, is to be accomplished in the exercise of the trial court's sound discretion.[4] In other words, the nature and degree of the antagonism and its effect on the number of peremptory challenges allocated to each litigant or side are matters left to the discretion of the trial court. *E.V.R. II Assoc., Ltd. v. Brundige*, 813 S.W.2d 552, 556 (Tex.App.-Dallas 1991, no writ); *Webster v. Lipsey*, 787 S.W.2d 631, 638 (Tex. App.-Houston [14th Dist.] 1990, writ denied). Thus, assuming the issue of equalization were properly

---

4. *Compare Am. Cyanamid Co. v. Frankson,* 732 S.W.2d 648, 660–61 (Tex.App.-Corpus Christi 1987, writ ref'd n.r.e.) ("The existence of antagonism is not a discretionary matter; it is a question of law ...."), *with Patterson*

*Dental Co. v. Dunn,* 592 S.W.2d 914, 919 (Tex.1979) (noting that the law "does grant discretionary power to the trial court in allocating strikes").

before this Court, we would decide whether the trial court's allocation of peremptory challenges amounted to an abuse of discretion. *See Am. Cyanamid Co. v. Frankson*, 732 S.W.2d 648, 661 (Tex.App.-Corpus Christi 1987, writ ref'd n.r.e.) ("[I]f the trial court's decision is based upon a reasonable assessment of the situation before it at the time the challenges are made, the decision should remain intact.").

Pojar argues, and the dissent would apparently find, that the trial court abused its discretion. Each relies on the supreme court's opinion in *Dunn* for the proposition that it is reversible error to require two antagonistic defendants to share six strikes against a plaintiff's six strikes. *See Dunn*, 592 S.W.2d at 918. We believe this is a misreading of *Dunn*.

 *Dunn* clarified that antagonism between co-defendants does not require exact numerical equality of peremptory challenges. *Id.* at 920. That is, two co-defendants are not each entitled to six peremptory challenges simply because they are antagonistic. *See id.* In fact, *Dunn* recognized the trial court's discretion to create disparity in the number of challenges to promote the ends of justice and to eliminate any unequal advantage. *Id.* at 919–20. In reaching its holding, the supreme court noted that a disparity of two-to-one would generally be acceptable, whereas a disparity of four-to-one would be an abuse of discretion. *Id.* at 920.

We believe that the disparity ratio in this case was between two-to-one and three-to-one. Given that the trial court did not allow counsel for Cifre and McCormick to work together in exercising their challenges and given that there was antagonism between not only McCormick and Pojar but also between Cifre and McCormick, we conclude that there was no abuse of discretion. In the paragraphs below,

we elaborate on our reasons for reaching this conclusion.

Pojar and the dissent are correct in noting that the *Dunn* opinion includes language to the effect that it is reversible error to require two antagonistic defendants to share six strikes against a plaintiff's six strikes. *Id.* at 918. Nevertheless, this was not the holding of the *Dunn* case. *See id.* *Dunn* involved one plaintiff, who got six challenges, and four defendants, who each got six challenges. *Id.* at 917. Thus, in actuality, *Dunn* did not involve two antagonistic defendants sharing six strikes, as the dissent suggests. Rather, *Dunn* involved four defendants with 24 strikes against a plaintiff with only six strikes, a situation much different than the one presented by the instant case. *Id.*

The language included in *Dunn* and relied upon by Pojar and the dissent references the supreme court's noteworthy holding in *Tamburello*. *See id.* at 920 (citing *Tamburello*, 392 S.W.2d at 118). Prior to *Tamburello*, a refusal to allow the proper number of peremptory challenges was regarded as immaterial in the absence of a showing that the complaining party was required to accept one or more jurors whom he wished to challenge. *See, e.g., Wolf v. Perryman*, 82 Tex. 112, 17 S.W. 772, 773 (1891). This is the same rule applicable to errors related to challenges for cause, *see Scurlock Oil Co. v. Smithwick*, 724 S.W.2d 1, 5 (Tex.1986), and presents a hurdle that is understandably difficult for many litigants to clear. *See Lopez v. Foremost Paving*, 709 S.W.2d 643, 644 (Tex.1986) (per curiam) ("[W]e [have] recognized that a complaining party who has been wronged by an error in awarding of peremptory strikes theoretically has an overwhelming burden.").

Although the difficult standard still applies to errors related to challenges for cause, *see Cortez ex rel. Estate of*

*Puentes v. HCCI–San Antonio, Inc.,* 159 S.W.3d 87, 91 (Tex.2005), the supreme court's decision in *Tamburello* "relaxed" the harmless-error rule as it applies to the allocation of peremptory challenges. In *Tamburello,* the supreme court acknowledged that, in cases involving peremptory challenges, it would be too difficult for a litigant to prove that the error probably resulted in an improper judgment. *Tamburello,* 392 S.W.2d at 117. The supreme court therefore relaxed the harmless-error rule and instructed reviewing courts to focus instead on whether, given the error, "it reasonably appears that the trial was materially unfair." *Id.* at 118.

In *Tamburello,* the supreme court concluded that the evidence was "sharply conflicting." *Id.* It then noted that, if each defendant had been given six strikes, as would have been proper, "the jury would have been composed of six persons who served on the jury and six other members of the panel who did not." *Id.* The court then concluded, "A jury so constituted might well have exonerated one of the defendants entirely, and it is our opinion that the trial was so materially unfair that the judgment cannot be upheld." *Id.*

*Tamburello* was thus plainly based on the premise that, once antagonism between co-defendants is discovered, each co-defendant is entitled to six peremptory challenges. In *Dunn,* a case that was decided much later, the supreme court clarified that antagonism between co-defendants does not require exact numerical equality of peremptory challenges. *See Dunn,* 592 S.W.2d at 920. In other words, co-defendants are not each entitled to six peremptory challenges simply because they are antagonistic. *See id.* Nevertheless, as discussed below, *Tamburello* remains important authority in this area of the law.

Over the years, the supreme court continued to apply *Tamburello's* materially-unfair-trial test and reached other noteworthy decisions in cases such as *Roy L. Martin & Assocs., Ltd. v. Renfro,* 483 S.W.2d 845, 851–52 (Tex.App.-San Antonio 1972) and *Perkins v. Freeman,* 518 S.W.2d 532, 534 (Tex.1974). The court ultimately relied on its precedent in *Tamburello, Renfro,* and *Perkins* to articulate a test for reversible harm in *Dunn,* the primary case relied upon by Pojar and the dissent. *See Dunn,* 592 S.W.2d at 921. Because of the significance of *Renfro* and *Perkins* in this regard, we pause to briefly discuss what happened in those cases.

In *Renfro,* the supreme court applied *Tamburello's* materially-unfair-trial test, but this time, the court took a slightly different approach than it did in *Tamburello,* choosing not to focus on whether a properly chosen jury would have likely reached a verdict in favor of the complaining parties. *Renfro,* 483 S.W.2d at 851–52. As in *Tamburello,* the court reviewed the evidence and concluded that it was "sharply conflicting." *Id.* at 851. It then focused on the disparity of power created by the trial court's error in allocating peremptory challenges. *Id.* at 851–52. The plaintiffs were given six peremptory challenges, and the defendants were given a total of 24 challenges, even though the defendants were not antagonistic. *Id.* at 851. The jury pool was made up of 42 prospective jurors. *Id.* Based on these facts, the court concluded that the defendants were given a "tremendous advantage" and held that the trial was therefore materially unfair. *Id.* at 851–52.

In *Perkins,* the supreme court also focused on the extent of the advantage created by the error rather than on whether a properly chosen jury would have likely reached a different result. *Perkins,* 518 S.W.2d at 534. In fact, the court held that

the trial was materially unfair without discussing any of the evidence or concluding that the evidence was "sharply conflicting." Instead, the court based its decision on the absence of any antagonism between the defendant and intervenors, who were each awarded six peremptory challenges. *Id.* The court noted that the plaintiff only received six challenges and concluded that the defendant and intervenors were therefore given an "unequal advantage." *Id.* The court then held that the "unequal advantage" rendered the trial "materially unfair." *Id.*

In *Dunn*, the supreme court relied on *Tamburello, Renfro,* and *Perkins* to explain, in slightly different terms, how the materially-unfair-trial test is to be applied to errors related to the allocation of peremptory challenges:

> Whether any such error resulted in a materially unfair trial ... must be decided from an examination of the entire trial record. For example, in a case in which the complaining party failed to prove his cause of action or defense, an error in allocating or equalizing strikes could not be said to have resulted in a materially unfair trial. On the other hand, when the trial is contested and the evidence is sharply conflicting, the error

results in a materially unfair trial without showing more.

*Dunn*, 592 S.W.2d at 921.

The supreme court and intermediate appellate courts currently use this statement of the law ("the *Dunn* test") as a test for reversible harm. *See Garcia*, 704 S.W.2d at 737 (applying the *Dunn* test). The *Dunn* test appears to differ somewhat from the approaches taken in *Tamburello, Renfro,* and *Perkins*, which each considered the extent of the unfair advantage created by the trial court's allocation of challenges.

Notably, most, if not all, errors evaluated under *Dunn's* reversible-error test have led to reversal.[5] This trend appears to follow from the test's exclusive focus on whether the trial was "hotly contested" and the evidence "sharply conflicting," rather than on the extent to which an unfair advantage was actually created by the allocation of challenges. Consider, for instance, the scarce number of cases that actually reach a jury verdict that are not "hotly contested." And, of course, if the evidence were anything other than "sharply conflicting," the central issue on appeal would not likely be a remand point such as allocation of peremptory challenges but probably a rendition point such as legal sufficiency of the evidence. Thus, the

---

5. Consider the following cases that were each decided under the test for harm announced in *Dunn* and led to reversals: *Garcia v. Cen. Power & Light Co.*, 704 S.W.2d 734, 737 (Tex. 1986) ("[W]e hold that this was a hotly contested trial which resulted in a materially unfair trial as a matter of law."); *"Y" Propane Serv. v. Garcia*, 61 S.W.3d 559, 570 (Tex.App.-San Antonio 2001, no pet.) (" 'Y' Propane's liability for the explosion was hotly contested, and the liability evidence was sharply conflicting. We therefore hold the error is reversible."); *Van Allen v. Blackledge*, 35 S.W.3d 61, 66–67 (Tex.App.-Houston [14th Dist.] 2000, pet. denied) ("Given the contested and conflicting nature of the evidence, we find that ... the trial [was] materially unfair."); *Carr v.*

*Smith*, 22 S.W.3d 128, 136 (Tex.App.-Fort Worth 2000, pet. denied) ("This case was hotly contested and the evidence sharply conflicting."); *Vargas v. French*, 716 S.W.2d 625, 627 (Tex.App.-Corpus Christi 1986, writ ref'd n.r.e.) ("Appellant met her burden of showing that the trial was hotly contested and the evidence sharply conflicting. We hold that the error resulted in a materially unfair trial."); *Parker v. Associated Indem. Co.*, 715 S.W.2d 398, 401 (Tex.App.-San Antonio 1986, writ ref'd n.r.e.) ("[T]he trial was hotly contested and the evidence sharply conflicting. It is not required that the plaintiffs show more for this court to conclude the error resulted in a materially unfair trial.").

*Dunn* test, which began as a "relaxed" harmless-error rule, has become a virtual rule of automatic reversal. We are unaware of any error in the allocation of peremptory challenges that has ever survived the *Dunn* test.

We do not suggest that this Court should denounce the *Dunn* test or somehow side-step it. Instead, we simply note our concern that, in applying the *Dunn* test, some courts have inadvertently relaxed the complaining party's initial burden of showing actual error. In particular, we are concerned that, in not joining today's decision, the dissent has overlooked the considerations of fairness articulated not only in *Dunn* but also in *Tamburello, Renfro, Perkins,* and rule 233. We believe these considerations remain an integral part of today's jurisprudence. Whether an unfair advantage was created by the trial court's allocation of challenges is a preliminary question that must be answered to determine whether the trial court actually erred. The supreme court made this very clear in *Dunn,* which included an extensive discussion of the trial court's discretion to allocate peremptory challenges to promote the "ends of justice" and the elimination of "unequal advantage." *Dunn,* 592 S.W.2d at 919–20.

Notwithstanding rule 233 and the foregoing precedent, reviewing courts all too often neglect to discuss the trial court's discretion, rarely spending more than a word on the issue of fairness. In not joining today's decision, for instance, the dissenting justice states that he would find reversible error; however, he does not discuss how the trial court's allocation of peremptory challenges actually created an unfair advantage, nor does he provide the trial court with any guidance on how to allocate challenges on remand to avoid a second reversal. This is particularly ironic because, in reaching its ruling, the trial

court expressly noted the uncertainty created by this Court's precedent in *Wendt,* which also failed to provide guidance on how to equalize peremptory challenges to avoid reversal. *See Wendt,* 718 S.W.2d at 770.

We believe that the trial court did not abuse its discretion. The nature and degree of the antagonism and its effect on the number of peremptory challenges allocated to each litigant or side are matters left to the discretion of the trial court. *Brundige,* 813 S.W.2d at 556; *Webster,* 787 S.W.2d at 638. No bright-line rule governs the trial court's discretion, but this much is clear: equalization does not mean exact numerical equality. *Dunn,* 592 S.W.2d at 920. The advancement of the ends of justice and the elimination of unfair advantage remain the safest guideposts for the courts, ever reminding us that, above all, the jury selection process should never be one-sided.

In this case, the trial court's allocation of challenges and instructions regarding how the challenges could be exercised were calculated to eliminate the possibility that an unfair advantage would arise from the antagonism between the co-defendants. The court accounted for the antagonism by allocating separate strikes to each defendant rather than giving them six to share. Numerical equality of challenges is not required, and thus, the fact that each defendant received only three challenges as compared to the plaintiff's six does not *ipso facto* establish an abuse of discretion. *See Dunn,* 592 S.W.2d at 920.

The co-defendants were not forced to share their strikes, but they were given the option to collaborate if they desired to do so. Inherent in this ruling is a finding that despite the chumminess between Cifre and McCormick, the co-defendants still had an overriding common interest in defeating Cifre's claims against them, even

if this common interest were strictly limited to the issue of damages. The chumminess, in turn, was accounted for by the trial court's specific instruction forbidding Cifre and McCormick from working together in exercising their challenges. The trial court thus attempted to minimize the possibility that an unfair advantage would arise.

Although the supreme court found reversible error in a somewhat similar situation in *Tamburello*, as discussed above, that decision was premised on case law holding that, once antagonism is discovered, the litigants are each entitled to exactly six strikes. *Tamburello*, 392 S.W.2d at 116. The supreme court has since explained that exact numerical equality is not required. *Dunn*, 592 S.W.2d at 920. According to the supreme court, the extent to which equalization is required depends upon the circumstances of the particular case, the information available to the trial court, the extent and degree of the antagonism, whether the parties collaborate in selecting jurors to be struck, the number of jurors available on the panel, and such other considerations as meet the criteria of promoting the "ends of justice" and preventing "unequal advantage." *Id.* The supreme court then noted the following:

> [I]n most cases a two-to-one ratio between sides would approach the maximum disparity allowable. In cases in which the disparity between strikes allowed the two sides did not exceed a two-to-one ratio, courts have held that there was no abuse of discretion. On the other hand, a disparity of four-to-one between sides has been held erroneous.

*Id.* (citations omitted). In *Dunn*, the court was faced with a four-to-one disparity, which it held was erroneous. *Id.*

This case would involve a three-to-one disparity, if we were to consider Cifre and McCormick as one side with a total of nine

challenges and Pojar as the other side with only three challenges. But that estimate is incorrect because it neglects to account for the trial court's instruction forbidding any cooperation between Cifre and McCormick. These litigants were not allowed to act as a single side in selecting a jury, and there has been no allegation on appeal that they did so in violation of the trial court's instruction. It is therefore inappropriate to consider them as one side in estimating the disparity in the allocation of peremptory challenges. The disparity ratio is thus closer to two-to-one-to-one, considering that Cifre had six challenges, Pojar had three challenges, and McCormick had three challenges.

Regardless of how the ratios are calculated, even the estimate that favors Pojar the most places this case in the gray area between the allowable two-to-one ratio and the erroneous four-to-one ratio. In light of the instructions given by the trial court, we conclude that the disparity created by the court's allocation of peremptory challenges was an allowable ratio.

■ It is settled in Texas that an abuse of discretion does not exist merely because an appellate court would have decided a discretionary issue differently than the trial court. *See, e.g., M.N.G.*, 147 S.W.3d at 530. Affording all due respect to the trial court's discretion in allocating peremptory challenges, we conclude that no reversible error has been shown.

Pojar's first issue is overruled.

## III. Evidence of Marijuana Use

In his second issue, Pojar contends that the trial court abused its discretion by admitting evidence of marijuana use. The complained-of evidence is presented in four different categories:

(1) Evidence that Pojar had marijuana metabolites in his urine;

(2) Evidence that Pojar had smoked an unknown quantity of marijuana on the night in question, of an unknown quality, and at an unknown time before driving;

(3) Evidence that Pojar had smoked marijuana in the past; and

(4) Evidence that Pojar had a "4:20" bumper sticker, which expressed ill-defined but generally positive feelings about marijuana.

Pojar argues that he is entitled to a new trial because this evidence was irrelevant and unfairly prejudicial. *See* TEX.R. EVID. 401, 403. In response, Cifre contends, *inter alia*, that Pojar failed to object to the evidence and that no issues regarding its admission were preserved for appellate review. Pojar maintains that the issues were preserved because he secured a running objection to the disputed evidence prior to its admission and outside the presence of the jury. *See* TEX.R. EVID. 103(a)(1).

Having reviewed the record, we conclude that Pojar waived all objections, and thus any error, related to the admission of evidence in the first, third, and fourth categories. Accordingly, we need not decide whether Pojar adequately objected to this evidence. *See* TEX.R.APP. P. 47.1.

In the analysis that follows, we first demonstrate how Pojar waived his objec-

tions (assuming they were adequate) to evidence in the first, third, and fourth categories. We then address the second category of evidence and discuss how Pojar's objection to that category of evidence was inadequate to preserve error for appellate review. *See* TEX.R.APP. P. 33.1(a).

## A. Marijuana Metabolites

■ Pojar complains that the trial court erred by admitting evidence that marijuana metabolites were discovered in his urine after the accident, but the record shows that his attorney was the first to mention this evidence at trial. Counsel discussed the evidence during his opening statement, after the trial court had granted him a running objection to any mention of marijuana use by Scott Pojar.[6]

For the sake of clarity, we begin with what Cifre's attorney said about marijuana during his opening statement, which came first, and then turn to what the other attorneys said in their opening statements.

After discussing the evidence he would produce to prove that Scott Pojar caused the accident by either running a red light or failing to keep a proper look out, counsel for Cifre turned his attention to Jamie McCaughey and his testimony as an eye-witness in support of Scott Pojar's version of events:

---

6. The reporter's record shows that the following exchange occurred prior to opening statements and outside the presence of the jury:

**Counsel for Pojar:** I have put on the record in a number of ways my objections to the evidence of marijuana in this case. And the Court has graciously acknowledged a running objection on voir dire during this issue. It's distasteful for me to interrupt opening arguments but I do need to bring to the attention of the Court that I do object to any opening statements regarding marijuana in this case and would respectfully request that the Court knowledge [sic] that the Court knows that I

object to that and that this allows me to make a record of those objections without interrupting Mr. Williamson or Mr. Williams to make that objection.

**The Court:** Just to be clear, you are objecting to any mention of marijuana usage by Mr. Pojar, you are not objecting as to McCaughey, or whatever his name is as the passenger?

**Counsel for Pojar:** That's correct.

**The Court:** I will overrule your objection and it's a running objection throughout the trial. But feel free to make it as many times as you need. I am not trying to cut you off.

**Counsel for Cifre:** But Mr. McCaughey admits he smoked marijuana that night. In the two hours previous to the accident. They admit 2:00 in the morning and he admits he smoked marijuana and admits he drank alcohol. At a minimum he drank a 32 ounce beer. For those of you who don't know how big that is, it is almost three beers.

Mr. McCaughey claims he is positive this was a green light, positive he was awake, positive he was alert, and positive he is not mistaken. Those are not the characteristics of people smoking marijuana and drinking alcohol. I am not asking you [to] decide the case on the entire prejudice of drugs and alcohol, but I am asking you to decide the case on the facts about who's accurate in what they found. I am asking you to do that and I am asking you to tell me about it.

Mr. Pojar denies consumption that evening, and you will hear testimony about that, expect you will hear about it during trial. But that, in a nutshell, is what we're going to be trying to establish to you with the evidence. What I said is not evidence. You should put the burden on me to bring what I said I would bring.

I will be going through witnesses, for example, friends of theirs with them that night. Friends of theirs that will testify about drugs and marijuana use. That's not my proffered order of witnesses, but they are under subpoena and have jobs so I am trying to get them on so you can hear their testimony; okay?

In his opening statement, Cifre's attorney never mentioned any evidence of marijuana metabolites in Scott Pojar's urine or the results of any drug test. Nor did counsel mention or suggest he would present any expert testimony on toxicology. Counsel primarily focused on Jamie McCaughey and whether his eyewitness testimony was believable given that he admitted using marijuana and alcohol on the night of the accident. Counsel suggested that the jury would hear testimony about whether Scott Pojar used marijuana on the night of the accident, but this evidence was limited to the testimony of "friends of theirs with them that night." Counsel was careful to avoid directly accusing Scott Pojar of using marijuana or telling the jury that he would present conclusive, scientific proof on the issue.

Counsel for McCormick was next to give an opening statement. He did not discuss any evidence related to marijuana metabolites or Scott Pojar's use of marijuana on the night of the accident or in the past.

Finally, Pojar's attorney gave an opening statement. He began by bringing up the evidence of marijuana metabolites:

**Counsel for Pojar:** The fact is Scott Pojar had metabolites of marijuana in his urine. You will hear testimony in the case. Even the hired expert for the plaintiffs agrees marijuana in your urine is not in your body, not in your system, it is not effecting [sic] you. You will hear scientific evidence with regard to marijuana.

We believe counsel's preemptive injection of marijuana metabolites at trial is fatal to the sub-issue on appeal. As shown above, Pojar' s attorney was the first to raise the issue before the jury. In fact, during the course of the trial, counsel for Cifre never introduced any evidence of marijuana metabolites and did not call any expert witness to testify about marijuana, marijuana metabolites, or toxicology.

 A party on appeal may not object to the admission of incompetent evidence that he offered or brought out that related

to an issue which he first injected into the case. *See McInnes v. Yamaha Motor Corp.*, 673 S.W.2d 185, 187–88 (Tex.1984); *Varel Mfg. Co. v. Acetylene Oxygen Co.*, 990 S.W.2d 486, 499 (Tex.App.-Corpus Christi 1999, no pet.); *Pouncy v. Garner*, 626 S.W.2d 337, 340 (Tex.App.-Tyler 1981, writ ref'd n.r.e.); *Hughes v. State*, 302 S.W.2d 747, 750 (Tex.Civ.App.-Eastland 1957, writ ref'd n.r.e.). Counsel for Pojar was not only the first to mention marijuana metabolites to the jury, he also called Brenda Pojar as a witness and she gave the following testimony on direct examination:

Counsel for Pojar: While you were there at the hospital, did you become informed that they had found metabolites of marijuana in his [Scott Pojar's] urine?

Brenda Pojar: Yes.

Counsel for Pojar: Did that upset you?

Brenda Pojar: Yes.

Counsel for Pojar: Did you get an opportunity to talk to him about that?

Brenda Pojar: Not in the hospital.

Counsel for Pojar: Okay. But you and Ron confronted him with that?

Brenda Pojar: Yes.

Based on counsel's preemptive statements to the jury and the testimony he offered from Brenda Pojar on direct examination, we conclude that Pojar waived any objection, and thus any error, regarding the admission of evidence that marijuana metabolites were found in Scott Pojar's urine. *See McInnes*, 673 S.W.2d at 187–88; *Varel Mfg.*, 990 S.W.2d at 499; *Pouncy*, 626 S.W.2d at 340; *Hughes*, 302 S.W.2d at 750.

### B. Past Use of Marijuana

■ Counsel for Pojar was also the first to inform the jury that Scott Pojar had used marijuana before the night of the accident. He then produced direct testimony to prove the history of marijuana use. On appeal, Pojar complains that the evidence of past use of marijuana was inadmissible. Again, we find that any error was waived. *See McInnes*, 673 S.W.2d at 187–88; *Varel Mfg.*, 990 S.W.2d at 499; *Pouncy*, 626 S.W.2d at 340; *Hughes*, 302 S.W.2d at 750.

In his opening statement, counsel for Pojar informed the jury that Scott Pojar had used marijuana approximately 27 hours before the accident. Counsel suggested that this use of marijuana did not impair Scott Pojar on the night of the accident and that it explained the presence of marijuana metabolites in Scott Pojar's urine on the day after the accident. These remarks appear to be an effort by counsel to soften the blow or remove the sting of the evidence of marijuana metabolites; however, no such evidence had been mentioned to the jury by anyone or admitted into evidence prior to counsel's remarks.

The record shows that counsel for Pojar was the first to inform the jury that Scott Pojar had a history of marijuana use that preceded the night of the accident. Counsel for Pojar also introduced substantial evidence of Scott Pojar's past use of marijuana and his preferences in using marijuana.

For instance, Brenda Pojar gave the following testimony on direct examination:

Counsel for Pojar: At any time in the past had he ever smoked marijuana?

Brenda Pojar: Yes.

Counsel for Pojar: How did you find out he even knew anything about marijuana?

Brenda Pojar: I overheard a phone conversation he was having. And I don't remember exactly what I heard, but I heard marijuana and I confronted him about it.

**Counsel for Pojar:** Did you-all extract a promise that he would not do that again?

**Brenda Pojar:** Yes.

**Counsel for Pojar:** Did he break that promise?

**Brenda Pojar:** Yes.

Counsel for Pojar also offered the following testimony from Jamie McCaughey on direct examination:

**Counsel for Pojar:** Okay. But when you were smoking dope before this [accident] happened, it would not be unusual for you to smoke four or five joints?

**Jamie McCaughey:** Four or five sweets actually.

**Counsel for Pojar:** Okay. What's a sweet?

**Jamie McCaughey:** Blunts?

**Counsel for Pojar:** Bigger joints?

**Jamie McCaughey:** Yeah.

**Counsel for Pojar:** Okay. And that would also be on occasions when you were with Mr. Pojar?

**Jamie McCaughey:** No, we only smoked bowls. He didn't like smoking joints.

**Counsel for Pojar:** Okay. What's a bowl?

**Jamie McCaughey:** Like a little pipe. Little bit in it because he didn't like getting high because he always had to go home and check in or something.

**Counsel for Pojar:** Okay.

**Jamie McCaughey:** He didn't like getting high.

**Counsel for Pojar:** Okay. The—when was the last time—I guess you smoked dope with Mr. Pojar that Friday before [the accident which occurred early Sunday morning]?

**Jamie McCaughey:** Uh-huh.

**Counsel for Pojar:** In truth and fact whenever you and him split up on Friday night—what time did you and him split up on Friday night?

**Jamie McCaughey:** About 12:00. He had to go to work the next morning. So, he went home.

**Counsel for Pojar:** Okay. So y'all were smoking dope up until 12:00 midnight on Friday night?

**Jamie McCaughey:** No, we weren't smoking all day. We smoked like— we smoked about two hours before we went home. So, his parents wouldn't know he was high.

**Counsel for Pojar:** Okay.

**Jamie McCaughey:** So, he smoked a bowl; and that's about all he smoked.

Given counsel's preemptive injection of the issue of past marijuana use in his opening statement and his subsequent offer of evidence on the same subject, we conclude that any objections, and thus any error, related to the admissibility of such evidence were waived. *See McInnes,* 673 S.W.2d at 187–88; *Varel Mfg.,* 990 S.W.2d at 499; *Pouncy,* 626 S.W.2d at 340; *Hughes,* 302 S.W.2d at 750.

### C. "4:20" Bumper Sticker

▬ Pojar also complains of evidence that his vehicle had a "4:20" bumper sticker on its rear windshield. Before trial, Pojar filed a motion *in limine* regarding evidence that "the automobile driven by Scott Pojar did or did not have a bumper sticker relating to the issue of Marijuana for the reason that said evidence is highly prejudicial and not relevant to any issue in this case." At a hearing on Pojar's motion, counsel for Cifre explained that "4:20 is an old police code for marijuana, and there is a web site that talks about the legalization of marijuana and [that] there is an organization [promoting its legalization]." Counsel for Pojar then asked,

"What's it relevant to?" Counsel for Cifre gave a detailed response, explaining how the evidence was relevant to the claims of negligent entrustment against Brenda Pojar and negligence against Scott Pojar, as well as issues related to punitive damages.[7]

The trial court overruled Pojar's motion *in limine* as it related to the "4:20" bumper sticker. No further objections were made specifically to the "4:20" bumper sticker, though the trial court subsequently granted a running objection "to any mention of marijuana usage by Mr. Pojar." *See* footnote 6.

 As a preliminary matter, we question whether Pojar preserved any error regarding the complained-of evidence. A ruling on a motion *in limine* is not a ruling on the admissibility of evidence and does not preserve error. *Huckaby v. A.G. Perry & Son, Inc.*, 20 S.W.3d 194, 203 (Tex.App.-Texarkana 2000, pet. denied); *Southwest Country Enter., Inc. v. Lucky Lady Oil Co.*, 991 S.W.2d 490, 493 (Tex. App.-Fort Worth 1999, pet. denied); *Glenn*

*v. Kinco Crane, Inc.*, 836 S.W.2d 646, 648 (Tex.App.-Houston [1st Dist.] 1992, no writ). Consequently, the trial court's denial of Pojar's motion *in limine* did not preserve the complaint now raised on appeal.

 If an issue was preserved, it was by Pojar's running objection. In footnote 6, we documented the exchange that led to the running objection. In that exchange, there was no specific reference to the "4:20" sticker or any discussion of its admissibility. To preserve error, "a running objection is required to be specific and unambiguous." *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 904 (Tex. 2004); *Huckaby*, 20 S.W.3d at 203. We believe that Pojar's running objection "to any mention of marijuana usage" was unambiguous, but we question whether it was sufficiently specific to make the trial court aware of his specific objections to the "4:20" bumper sticker. *See* Tex.R.App. P. 33.1(a).[8]

7. In counsel's words:

 [It is] relevant to negligent entrustment. [It is] relevant to punitive damages, namely operation of a motor vehicle under [the influence of] intoxicants and doing so knowingly, and when you have a history of doing so and relevant to show he had a habitual use of narcotics, and at that point who knew or should have known by his parents.

 He is using marijuana several times a week; has problems with school. He has problems—he is not attending school. He is skipping school. He is known to have used marijuana by his parents. He is doing it several times a week. He has drug paraphernalia in the way of a pipe. [He] has drug paraphernalia in the way of rolling papers. And he has a bumper sticker on his car which, in fact, is advocating legalization of marijuana.

 The point I am making goes to punitives [sic] . . .

 It goes to the accident or mistake. It goes to the fact that he knew what he was doing; knew what he was doing on the evening in

 question; knew what he was doing 24-hours earlier when he smoked marijuana, and it goes to his state of mind to show that he was consciously—two things, goes to the negligent entrustment issue and goes to the fact that he was consciously indifferent to use of a motor vehicle while using intoxicants and direct relevant to that . . .

8. On appeal, Pojar contends that the evidence was inadmissible on First Amendment grounds that were never specifically raised before the trial court:

 [The admission of such evidence] will chill litigants' First Amendment rights to express political views. Bumper stickers that advocate the legalization of marijuana come well within the scope of protected First Amendment speech. The sticker proved little or nothing, yet managed to both instill unfair prejudice in the jury and chill Pojar's First Amendment rights. The trial court blatantly abused its discretion by allowing this evidence.

 Appellant's Brief, p. 38 (citations omitted). To the extent Pojar challenges the evidence

Although we question the adequacy of Pojar's objection, we conclude that such considerations are of little consequence because Pojar subsequently waived any objection at trial. In explaining our basis for reaching this conclusion, we emphasize how the "4:20" evidence was produced at trial. The first reference to it was made on re-cross-examination of Joshua Cast, a witness called by Cifre. Counsel for McCormick raised the issue of whether there was a bumper sticker on Scott Pojar's car. Then, on re-direct examination, counsel for Cifre introduced, without objection, a picture of the bumper sticker on Scott Pojar's car and additional testimony about its meaning:

**Counsel for McCormick:** You said you had been in Mr. Pojar's car?

**Joshua Cast:** Yes, sir.

**Counsel for McCormick:** Did you notice the sticker he had on the back windshield?

**Joshua Cast:** No, sir.

**Counsel for McCormick:** You never saw the 4:22[sic] sticker on the back of his windshield?

**Joshua Cast:** No, sir.

**Counsel for McCormick:** Do you know what 4—4:20 [means]?

**Joshua Cast:** Yes, I do know what that means.

**Counsel for McCormick:** What does it mean?

**Joshua Cast:** It's a smoking thing.

**Counsel for McCormick:** Smoking marijuana thing?

**Joshua Cast:** Yes, sir.

**Counsel for McCormick:** Meaning you agree with it?

**Joshua Cast:** Yes, sir.

**Counsel for McCormick:** Meaning you think it ought to be legalized?

**Joshua Cast:** Yes, sir.

**Counsel for McCormick:** Did you know Mr. Pojar had the sticker on the back of his windshield?

**Joshua Cast:** No, sir.

**Counsel for McCormick:** Would you be surprised to learn that?

**Joshua Cast:** Not very.

**Counsel for McCormick:** You are not surprised because you knew he agreed with it, didn't you?

**Joshua Cast:** Yes, sir.

**Counsel for McCormick:** Pass the witness

**Counsel for Cifre:** I have a follow-up to that.

**The Court:** [It is Pojar's] turn.

**Counsel for Pojar:** Nothing further.

**Counsel for Cifre:** Your Honor, I would offer in evidence Plaintiff's No. 113A, a photograph of Mr. Pojar's car after the accident.

**The Court:** Any objection?

**Counsel for Pojar:** No.

**Counsel for McCormick:** No.

**The Court:** Admitted

**Counsel for Cifre:** Does this look like Scott's car?

**Joshua Cast:** Yes.

**Counsel for Cifre:** See the bumper sticker?

**Joshua Cast:** Yes.

**Counsel for Cifre:** Says 4, colon, 20?

based on his First Amendment right to advocate for the legalization of marijuana, he has not preserved error by a timely, specific objection. *See* Tex.R.App. P. 33.1(a). Consequently, the only question before this Court is whether Pojar's running objection was suffi-

ciently specific as a rule 401 or 403 objection to the bumper sticker. *See* Tex.R. Evid. 401, 403. We do not answer this question because the record shows that Pojar subsequently waived any objection to the evidence by stating he had "no objection" to it.

**Joshua Cast:** Yes.

**Counsel for Cifre:** You all refer to that as 4:20. [Counsel for McCormick] shows how out of touch he is. He said 4:22.

**Joshua Cast:** Yes.

**Counsel for Cifre:** What is 4:20? I am sure Mr. Williams is happy not to be in touch with this part of the culture, but what is 4:20? I didn't know either, didn't ring a bell until a few days ago. What is 4:20?

**Joshua Cast:** I don't really know how to explain it.

**Counsel for Cifre:** Kind of a code word?

**Joshua Cast:** Kind of.

**Counsel for Cifre:** What's it a code word for?

**Joshua Cast:** Going to smoke. Smoking.

**Counsel for Cifre:** Smoking what?

**Joshua Cast:** Marijuana.

**Counsel for Cifre:** Okay. And if you know is there a website at 420 website?

**Joshua Cast:** I am pretty sure it is.

**Counsel for Cifre:** It talks about legalizing it?

**Joshua Cast:** Yes, sir.

**Counsel for Cifre:** Part of the movement to legalize marijuana?

**Joshua Cast:** Yes, sir.

**Counsel for Cifre:** So that's a sticker I guess you are advocating use or legalization of marijuana as a substance?

**Joshua Cast:** Yes.

**Counsel for Cifre:** You just never noticed it on Mr. Pojar's car?

**Joshua Cast:** No.

**Counsel for Cifre:** Is it a good idea to put it in on your car?

**Joshua Cast:** Probably not.

**Counsel for Cifre:** Why not?

**Joshua Cast:** Because I am sure police officers know what it means, too.

**Counsel for Cifre:** Did you know, Mr. Cast, that 420 is actually an old police code for marijuana? That's where it picks up off of?

**Joshua Cast:** I didn't know that.

**Counsel for Cifre:** Way they call in different codes for different types of offenses?

**Joshua Cast:** Yes.

**Counsel for Cifre:** I pass the witness.

 Counsel for Pojar not only failed to object to the testimony regarding the meaning of the "4:20" bumper sticker, he affirmatively stated that he had "no objection" to the admission of a photograph depicting the bumper sticker. If a party affirmatively asserts during trial that he or she has "no objection" to the admission of the complained-of evidence, any error in the admission of the evidence is waived, even in the face of a pretrial ruling. *Tex. DOT v. Pate,* 170 S.W.3d 840, 850 (Tex.App.-Texarkana 2005, no pet.); *In re R.S.C.,* 940 S.W.2d 750, 752 (Tex. App.-El Paso 1997, no writ); *see Duperier v. Tex. State Bank,* 28 S.W.3d 740, 755–56 (Tex.App.-Corpus Christi 2000, no pet.) (emphasizing counsel's statement that he had "no objection" to the complained-of evidence in holding that any objection in its admission was waived). Accordingly, we hold that Pojar waived any error regarding the admission of evidence related to the "4:20" bumper sticker.[9]

**9.** Even if Pojar's complaint were properly before this Court, we would still decline to grant relief on this sub-issue because Pojar's appellate brief fails to address and negate all legal bases for the trial court's ruling. *See The State Bar v. Evans,* 774 S.W.2d 656, 659 n. 5 (Tex.1989). As documented in footnote 7, the "4:20" bumper sticker was offered not only as

## D. Evidence of Scott Pojar's Marijuana Use on the Night of the Accident

■ Finally, Pojar contends that the trial court erred by admitting evidence that he had used marijuana on the night of the accident. Specifically, Pojar complains that a witness called by Cifre was allowed to testify that she saw Scott Pojar smoke marijuana before the accident. Counsel for Pojar did not object to the testimony at the time it was offered, but as noted above, the trial court had previously granted a running objection "to any mention of marijuana usage by Mr. Pojar." On appeal, Pojar argues that the eyewitness testimony was inadmissible under rules 401 and 403. *See* TEX.R. EVID. 401, 403.

As a preliminary matter, we must decide whether Pojar preserved any error in the admission of this testimony. *See* TEX. R.APP. P. 33.1(a). Pojar's running objection is quoted in footnote 6. Although the objection unambiguously covered "any mention of marijuana usage by Mr. Pojar," the grounds for the objection were not specified at the time it was granted. Instead, counsel asked the trial court to recognize the grounds raised in his previous objections to the evidence, which the court apparently agreed to do. Consequently, to determine whether Pojar made adequate 401 and 403 objections to the eyewitness

testimony, we must examine his earlier objections, which became running objections. *See* TEX.R. EVID. 401, 403.

Counsel for Pojar made objections to the evidence of marijuana use on five separate occasions: (1) at a pre-trial hearing on the jury questionnaires; (2) at a second pre-trial hearing on the jury questionnaires; (3) at a hearing on a motion *in limine* filed by Pojar; (4) during *voir dire;* and (5) prior to opening statements, when the trial court granted the running objection quoted in footnote 6.

None of the objections specifically addressed the admissibility of eyewitness testimony that Scott Pojar used marijuana on the night of the accident. Counsel expressed his general objection to any evidence of marijuana use, but he never specifically objected to the eyewitness testimony that was ultimately produced by Cifre at trial. Based on the following review of the record, we conclude that Pojar failed to preserve any error in the admission of eyewitness testimony that he used marijuana prior to the accident. *See* TEX.R.APP. P. 33.1(a).

The following exchange occurred during the first pre-trial hearing on the jury questionnaires:

**The Court:** You are saying that you think that mentioning marijuana with

---

evidence for the claim against Scott Pojar but also as evidence for the negligent entrustment claim against his mother, Brenda Pojar. At the time the evidence was admitted, the trial court had not yet dismissed the negligent entrustment claim by way of instructed verdict. Given that counsel for Cifre expressly argued that the evidence was admissible on the negligent entrustment claim, it was incumbent on Pojar to negate this basis for the trial court's ruling. *See Stewart v. Sanmina Tex., L.P.,* 156 S.W.3d 198, 214 (Tex.App.-Dallas 2005, no pet.) ("If any legitimate basis exists to support a trial court's evidentiary ruling, then we must uphold the court's decision."); *see also*

*Ortega v. LPP Mortg., Ltd.,* 160 S.W.3d 596, 599 (Tex.App.-Corpus Christi 2005, pet. denied) (same). Pojar has only addressed the ruling as it relates to his First Amendment rights, a basis not urged below, and as it relates to the claim against him for negligence. Because Pojar has not attempted to negate all bases for the trial court's ruling (specifically, whether the evidence was admissible on the claim against Brenda Pojar), we would be unable to find an abuse of discretion even if this sub-issue were properly before us. *See San Jacinto River Authority v. Duke,* 783 S.W.2d 209, 209–10 (Tex.1990).

respect to Mr. Pojar shouldn't happen at all?

**Counsel for Pojar:** Yes, ma'am. Yes, Your Honor. The evidence is when [counsel for Cifre] talks about his theory in this case, his theory in this case with regard to marijuana and Scott Pojar is that 27 hours after ingestion he is impaired.

* * *

**Counsel for Pojar:** The critical fact, I will be very, very candid, the critical fact is marijuana metabolites were found in Scott's system the morning after the accident. That's the critical thing because it's entirely consistent with him not having consumed for 27 hours. The medical literature states 27 hours out it will not have effect on him.

**Counsel for Cifre:** That's not true.

**Counsel for Pojar:** There are studies with regard to airplane pilots.

That's what he is citing. Anyway, the very damaging part is the urine—I mean, the metabolites in the urine. It is so prejudicial that that's what I am seeking to exclude.

* * *

**The Court:** Okay. Well, I am certainly going to let the fact that he tested positive for marijuana and smoked it in the car come in.

We will look at the Daubert stuff but I can't imagine the jury not knowing that with as much evidence as there is of marijuana usage going on in the car that they ought to get their own conclusions.

Although counsel objected to any mention of Scott Pojar's use of marijuana, he did so based on the unfairly prejudicial effect created by the evidence of marijuana metabolites. *See* TEX.R. EVID. 403. Counsel specified that, in his opinion, "the very

damaging part is the ... metabolites in the urine. It is so prejudicial that that's what I am seeking to exclude." Counsel never discussed or specifically objected to eyewitness testimony that Scott Pojar used marijuana on the night of the accident.

At a second pre-trial hearing on the jury questionnaire, the trial court again considered the admissibility of the evidence of marijuana use:

**The Court:** I thought that what we said last week was if I was going to let it in there was marijuana found in the car and marijuana found in ... Mr. Pojar's system.

**Counsel for Pojar:** Urine, more specifically.

**The Court:** That there was marijuana found in his urine, and no matter when it was ingested I was going to allow the jury to weigh all of that; that you had no objection to the questionnaire, per se, but you objected to that coming in, the fact that he had marijuana in his urine and marijuana was found in his car.

**Counsel for Pojar:** Your Honor, I think that's fairly close ... For the record, ... we would object to questions 31 through 43 on the grounds that this improperly puts before the jury the issues of drugs as regards the accident in question.

The basis for this objection is that the only apparent basis for inquiring about drugs as to my client Scott Pojar is the finding of metabolites of marijuana in the hospital after the accident, and the science indicates that that is not evidence of impairment and, therefore, is not only very, very prejudicial but it's immaterial to any issue in this case.

And I guess I would ask the Court to rule on that first.

**The Court:** That's overruled.

**Counsel for Pojar:** Secondly, ... we would ask the Court to treat this as a separate objection because the only basis for questions 33, 34 through 40, 42, and 43 would be the evidence of marijuana in Scott Pojar's urine after the accident, and that there is no evidence or credible evidence of scientific evidence to suggest that is an indication of impairment at the time of the accident, and therefore, is immaterial and very prejudicial to defendant Scott Pojar.

**The Court:** Okay. That's overruled.

Again, counsel for Pojar based his objection on the incompetency of marijuana metabolites to prove impairment at the time of the accident. Counsel never suggested that the question of impairment was irrelevant or unfairly prejudicial. Counsel took issue with how, in his opinion, opposing counsel would seek to prove impairment at trial, not with whether evidence of impairment was irrelevant or unfairly prejudicial.[10] Pojar's attorney repeatedly suggested to the trial court that the only evidence of impairment would be the marijuana metabolites and that such evidence was necessarily incompetent and therefore irrelevant and unfairly prejudicial.

The admissibility of marijuana evidence was raised a third time at a hearing on Pojar's motion *in limine*,[11] at which time, counsel for Cifre specifically advised the court and opposing counsel that he intended to establish impairment by producing eyewitness testimony that Scott Pojar used marijuana on the night of the accident:

**Counsel for Pojar:** [A]s to 19 and 20, Your Honor.

21, I guess, starts to delineate how far we go with all this business.

**The Court:** Okay. Well, I have ... denied 19 and 20, and then tell me is this here something that happened or argued to have happened before the accident?

**Counsel for Pojar:** Yes.

* * *

**Counsel for Cifre:** When they got there [to the house where they were before the accident] it is admitted by Mr. McCaughey and Mr. Young [that they] both got a 32 ounce beer ...;

---

10. On appeal, Pojar appears to concede that the issue of his impairment on the night of the accident was relevant. In part, he argues, "But there was no expert evidence to connect the urinalysis to any legally relevant effect, such as impairment." APPELLANT'S BRIEF p. 31. Thus, according to Pojar's appellate brief, impairment is a "legally relevant effect" that would be relevant evidence. His chief argument at trial and on appeal is that the presence of marijuana metabolites does not establish impairment.

11. The relevant portions of the motion are items 19, 20, and 21:
19. That tests performed at Hermann Hospital on the morning after the accident show the presence of the metabolites of Marijuana in the urine of Scott Pojar for the reason that this finding does not constitute evidence of impairment of Scott

Pojar at the time of this accident, and is, therefore, irrelevant to any issue in this case. To the extent that it has some arguable relevance, this evidence is highly prejudicial and its prejudice far outweighs any relevant to this case.

20. That Scott Pojar smoked Marijuana on any occasion for the reason that said evidence would not constitute evidence of impairment of Scott Pojar at the time of the accident and the prejudicial effect of this evidence would greatly outweigh any possible relevance.

21. That Scott Pojar, Beatrice Cifre, and Jamie McCaughey were going to a friend's house to find Marijuana on the evening of the accident in question for the reason that said evidence is highly prejudicial and not relevant to the cause of this accident.

that Mr. McCaughey and Mr. Young got there and there was some question whether there was drug use there, namely marijuana use, in addition to the alcohol which would, of course, corroborate why they went by there [allegedly to obtain marijuana]. Then they leave that house at some point in time [and get into the accident].

I believe the testimony may be conflicting whether they got drugs there or not. Mr. Pojar says there was [sic] no drugs there; he didn't do any. Mr. McCaughey says there was [sic] no drugs there; he didn't do any. And they left to take Mr. Young home but they did alcohol there.

**The Court:** Who says they did drugs there?

**Counsel for Cifre:** I believe I have two witnesses, Your Honor, who both said they smoked marijuana at the house.

**Counsel for Pojar:** They being the witnesses themselves?

**Counsel for Cifre:** No, they being Jamie McCaughey and/or possibly Scott Pojar. By the way, this is not hiding out. I took one of those statements last night and I told [counsel for Pojar] about it this morning, lest the Court think I am sandbagging him. I took the statement last night on the way to Galveston. I don't have it transcribed yet. He said Jamie McCaughey smoked dope there and another witness, I believe, Your Honor, I anticipate is going to testify via statement but I believe we will have a statement that said Jamie McCaughey and Scott Pojar smoked dope, so the evidence is conflicting.

**The Court:** I will grant it [referring to item 21] until I know more [about] what the evidence is.

**Counsel for Pojar:** Right. And it talks about intent, anyway, whether the conduct—conduct may be a different thing, but going there with intent seems to be something beyond evidence.

**Counsel for Cifre:** Driving around Galveston County looking for marijuana is not a reasonable thing to be doing. Goes to the facts and circumstances.

**The Court:** Goes to—there is a hotly contested issue [of] whether Scott was smoking dope that night, but I just need to hear more about it before I can—

**Counsel for McCormick:** The only thing I would add no different from any other car accident, "Where were you on the day of the accident and what did you do," it's the same type of evidence.

**The Court:** Except it's so prejudicial we have got to be careful with it.

**Counsel for Cifre:** It does, Judge. It goes to the issue of punitive damages and entrustment.

**The Court:** Jamie was the one [who] said that's what we intended to do, not Scott?

**Counsel for Cifre:** Scott was driving. It was his car and he was driving.

**The Court:** I am saying from what you have already told me about Jamie he has been a little inconsistent. I want to make sure we are not in a position [where] you ask a question and he says, "No," and that's all we have.

**Counsel for Cifre:** I see what you are saying.

**Counsel for Pojar:** Yes, Your Honor. I understand the Court's ruling and I will absolutely abide by it.

Mr. McCaughey said two separate statements. That's the specific reason, and Mr. McCaughey on separate

statements said Scott wanted to go by there, get more weed, and mid-sentence says we wanted to go by and get more weed.

**The Court:** It's probably coming in, but I will grant the motion in limine and, obviously, we will have to talk with Jamie before he goes on.

It appears that, during this exchange, counsel for Cifre revealed for the first time that he had eyewitnesses who would testify that Scott Pojar and Jamie McCaughey used marijuana immediately prior to the accident. Although counsel for Pojar acknowledged this new evidence, he did not raise an additional objection to it.

Instead of objecting to the eyewitness testimony, counsel focused on item 21 of his motion *in limine*, which concerned the reason for the teenagers' visit to the house before the accident. Counsel for Pojar did not want the jury to hear that his client and his client's friends were apparently looking for marijuana. The trial court granted the motion *in limine* as it related to this testimony, but the testimony was ultimately admitted at trial.

During *voir dire*, an objection to the issue of marijuana use was again made by counsel for Pojar:

**Counsel for Cifre:** Okay. All of you need—there were questions about marijuana, alcohol, and drugs in that, correct?

**Counsel for Pojar:** Your Honor, I hate to interrupt argument, but for the record I object to any reference to marijuana.

**The Court:** That objection is overruled and you may have a running objection.

**Counsel for Pojar:** Thank you. I just wanted to bring it to the attention of the Court. Thank you, very much.

Pojar's final objection to the evidence of marijuana use was made prior to opening statements. We have documented this objection in footnote 6. As mentioned above, Pojar's final objection did no more than incorporate his previous objections. No new objections were added.

From this review of the record, we conclude that Pojar never specifically objected to the eyewitness testimony that he used marijuana on the night of the accident. On appeal, a party is confined to the grounds for the objection made at trial. *Coke v. Coke*, 802 S.W.2d 270, 275 (Tex. App.-Dallas 1990, writ denied). A party cannot change or enlarge the objection on appeal. *Id.; see also Perez v. Baker Packers, Div. of Baker Int'l Corp.*, 694 S.W.2d 138, 141–42 (Tex.App.-Houston [14th Dist.] 1985, writ ref'd n.r.e.).

Pojar's objection to the evidence of his marijuana use on the night of the accident was premised on his attorney's belief that Cifre would attempt to prove Scott Pojar's impairment on the night of the accident solely by the presence of marijuana metabolites in his urine the day after the accident. This evidence was never offered by Cifre at trial. Instead, Cifre attempted to prove impairment by eyewitness testimony that Scott Pojar used marijuana on the night of the accident. No objections were made to this proof of impairment. Nevertheless, Pojar complains that the trial court erred by admitting the evidence. Because no objection was ever made to this specific evidence, we conclude that any error in its admission was not preserved for appellate review. *McCormick v. Tex. Commerce Bank Nat'l Asso.*, 751 S.W.2d 887, 890–91 (Tex.App.-Houston [14th Dist.] 1988, writ denied).

Pojar's second issue is overruled.

### IV. Award for Loss of Past Services

In his third issue, Pojar contends that the evidence is legally and factually

insufficient to support the jury's finding that $200,000 would fairly and reasonably compensate Neida and Wendell Cifre for their loss of Beatrice Cifre's services that "were sustained in the past." Pojar raised this issue in a motion to modify the judgment, which was denied by the trial court.

The standards of review for legal and factual sufficiency challenges are settled and will not be restated here.[12] Having reviewed the entire record in the light most favorable to Cifre, we conclude that there is no evidence to prove that Neida and Wendell Cifre have lost any services from Beatrice Cifre.

There was no direct testimony of lost services offered at trial. The evidence strongly indicates that Beatrice Cifre has performed only minimal services, if any, for her parents following the accident that left her a paraplegic. It is equally apparent that she and her family have suffered and continue to suffer tremendous physical, emotional, and financial hardships because of the injuries she sustained in the accident.

Nevertheless, we believe that such evidence, standing alone, is legally insufficient to establish $200,000 in lost services. The record contains no evidence that Beatrice Cifre ever performed any services for her parents, let alone evidence placing a monetary value on such services.

In *Gonzalez v. Hansen*, a case relied upon by Pojar, the San Antonio Court held that a parent could not recover for the loss of past services of her son, even though the undisputed evidence showed that the boy had been totally incapacitated for two months following an accident that left him permanently disfigured and handicapped. *Gonzalez v. Hansen*, 505 S.W.2d 613, 615

(Tex.Civ.App.-San Antonio 1974, no writ). In reaching this holding, the court emphasized the absence of evidence that the child's injuries prevented him from performing services he would have otherwise performed. *Id.*

We find it noteworthy that no Texas court has ever cited, much less relied on, the *Gonzalez* opinion. This is perhaps owed to the opinion's failure to acknowledge that virtually all able-bodied children perform some services, such as chores, for their parents. We believe this reality is within the ken of all reasonable jurors. A child's complete incapacity, as in the *Gonzalez* case, necessarily precludes the performance of any such services.

■ Contrary to Pojar's argument, we believe that the monetary value of a child's lost services is not akin to and cannot be measured with the mathematical precision of lost wages or the like. It makes little sense to demand that the value of such services be established by equally certain and objective proof. Nevertheless, the jury must assign some value to the lost services, and in *Gonzalez*, that value was $5,000. *Id.* at 613. Rejecting the jury's finding, the San Antonio Court noted that there was no evidence that, prior to the accident, the boy had been earning any money or performing any services or chores around the house. *Id.* at 615.

With measured approval, we follow the *Gonzalez* opinion. In doing so, we expressly decline to extend its precedential authority to demand proof that can never be given with any level of objective certainty. The value of a child's lost services to her parents is inherently subjective, even if it includes some objective elements, such as money earned from third parties.

12. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827–28 (Tex.2005) (legal sufficiency); *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761–62 (Tex.2003) (factual sufficiency).

We sustain Pojar's challenge to the legal sufficiency of the evidence because there is no evidence that Beatrice Cifre ever performed any services for her parents or evidence that she would have performed such services if she had not been injured. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827–28 (Tex.2005). Evidence of lost services could have easily been offered on direct examination and would not have presented the same concerns as evidence placing a monetary value on such services.

Accordingly, we hold that the trial court erred by failing to grant Pojar's motion to modify the judgment by deleting the award for loss of past services.

## V. Finding of Malice

In his fourth issue, Pojar asks this Court to render a new judgment that disregards the jury's finding of malice because the finding is immaterial and because it is supported by legally insufficient evidence. At a minimum, Pojar asks that he at least be given a new trial because the evidence is factually insufficient to prove malice.

■■■ A trial court may disregard a jury's finding only if it is unsupported by the evidence or it is immaterial. *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex.1994). Pojar advances both types of arguments. We will consider ma-

teriality first and then discuss the sufficiency of the evidence.

### A. Materiality

■■■ A jury finding is immaterial and may be disregarded if the question should not have been submitted to the jury or if the question, though properly submitted, was rendered immaterial by other findings. *Id.* According to Pojar, the jury's finding of malice was rendered immaterial by the jury's refusal to award any exemplary damages. Pojar supports this contention with a line of cases holding that "when the jury finds no damages, findings on issues of liability are immaterial."[13] Having reviewed this case law, we are compelled to note that several courts have actually stated the rule as follows: "the general rule [is] that where the jury finds no damages, findings on issues of liability are immaterial and *harmless*."[14] (emphasis added). Pojar has not discussed the "harmless" part of the "general rule" in advancing his argument to this Court.

We do not believe the general rule is necessarily determinative in cases involving a finding of malice and an award of zero exemplary damages. In fact, in this case, it is entirely plausible that the jury's finding of malice was not rendered immaterial by its finding that no exemplary damages were necessary "as a penalty" for Scott Pojar's behavior.[15] The rec-

---

13. The cases relied upon by Pojar include the following: *Anderson, Greenwood & Co. v. Martin*, 44 S.W.3d 200, 217 (Tex.App.-Houston [14th Dist.] 2001, pet. denied); *Hancock v. San Antonio*, 800 S.W.2d 881, 885 (Tex.App.-San Antonio 1990, writ denied); *Canales v. Nat'l Union Fire Ins. Co.*, 763 S.W.2d 20, 23 (Tex.App.-Corpus Christi 1988, writ denied); *Howard v. Faberge, Inc.*, 679 S.W.2d 644, 650 (Tex.App.-Houston [1st Dist.] 1984, writ ref'd n.r.e.); *Garza v. San Antonio Light*, 531 S.W.2d 926, 929 (Tex.Civ.App.-Corpus Christi 1975, writ denied); *Lewis v. Isthmian Lines, Inc.*, 425 S.W.2d 893, 894 (Tex.Civ.App.-Houston [14th Dist.] 1968, no writ).

14. *Hancock*, 800 S.W.2d at 885; *Canales*, 763 S.W.2d at 23; *Szmalec v. Madro*, 650 S.W.2d 514, 517 (Tex.App.-Houston [14th Dist.] 1983, writ dism'd w.o.j.); *Mitchell v. Chaparral Chrysler–Plymouth Sales, Inc.*, 572 S.W.2d 359, 360–61 (Tex.Civ.App.-Fort Worth 1978, writ ref'd n.r.e.); *Lewis*, 425 S.W.2d at 894.

15. The jury charge explained, " 'Exemplary damages' mean any damages awarded as a penalty or by way of punishment."

ord is replete with undisputed evidence that Scott Pojar suffered tremendous physical trauma as a result of the accident. Perhaps the jury did not assess any exemplary damages because Scott Pojar had already suffered so much that further punishment would have been excessive. It is not our place to speculate as to the reasons for the jury's verdict, but given the arguments advanced by Pojar, we are compelled to note that we do not view the award of zero exemplary damages as being inconsistent with the jury's finding of malice, nor do we think Scott Pojar should be relieved of the jury's finding of malice simply because it chose not to punish him for it.

In upholding the trial court's decision not to disregard the jury's finding of malice based on immateriality, we note that Pojar has produced no precedential authority for finding reversible error in circumstances such as these. Nor has Pojar produced a single published opinion holding that a finding of malice is rendered immaterial by an award of zero exemplary damages.

### B. Sufficiency of the Evidence

Pojar contends that the evidence is legally and factually insufficient to support the finding of malice. Malice is defined as

(A) a specific intent by the defendant to cause substantial injury to the claimant; or

(B) an act or omission:

(i) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(ii) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

Acts 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, eff. Sept. 2, 1987; *amended* by Acts 1995, 74th Leg., ch. 19, § 1, eff. Sept. 1, 1995.[16] In 1995, the legislature substituted malice for gross negligence as the prerequisite for punitive damages, but it also redefined malice, through the addition of subsection (B), to mirror the definition of gross negligence articulated by the Texas Supreme Court in *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 23 (Tex.1994). *Mobil Oil Corp. v. Ellender,* 968 S.W.2d 917, 921 n. 2 (Tex.1998). Consequently, prior precedent regarding gross negligence is relevant to a finding of malice as redefined by the above provision. *See Ellender,* 968 S.W.2d at 921 n. 2.

■■■ Because malice must be proved by clear and convincing evidence, an elevated standard of proof, we apply a more exacting approach on appeal by reviewing the evidence to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *See In re J.F.C.,* 96 S.W.3d 256, 264–68 (Tex.2002); *see also Southwestern*

---

16. The current version of this provision is found in section 41.001 of the civil practice and remedies code. TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(7) (Vernon Supp.2004–05). Section 41.001 of the Texas Civil Practice and Remedies Code was amended by Act of June 2, 2003, 78th Leg., ch. 204, § 13.02, 2003 TEX. GEN. LAWS 847, 887, eff. Sept. 1, 2003. Section 23.02(d) of Acts 2003, 78th Leg., ch. 204 provides that "[a]n action filed before the effective date of this Act ... is governed by the law in effect immediately before the change in law made by this Act, and that law is continued in effect for that purpose." The instant action was filed prior to September 1, 2003 and is therefore governed by the version of section 41.001 that was in effect prior to September 1, 2003. All citations to section 41.001 in this opinion refer to the version in effect prior to September 1, 2003.

*Bell Tel. Co. v. Garza,* 164 S.W.3d 607, 621–22 (Tex.2004).

As noted above, there was conflicting evidence presented at trial as to whether Scott Pojar had used marijuana on the night of the accident. There was also conflicting evidence as to which driver had a red light at the intersection and which driver had a green light. There was no evidence that the traffic lights had malfunctioned. In fact, everyone agreed that the accident was caused by one of the drivers running a red light. The jury found that Scott Pojar was the driver at fault.

■■■ On appeal, Pojar contends that the evidence is legally and factually insufficient to prove malice because this Court "must hypothesize" that "Pojar unintentionally ran a red light on a deserted road." Pojar also argues, "The testimony only supports the conclusion that Pojar was a safe driver." Finally, Pojar suggests that this Court should create a rule of law allowing "some degree of inebriation [by marijuana to be] ... permissible while driving." Based on these arguments, Pojar contends that the evidence is insufficient to prove anything more than simple negligence.

We disagree with Pojar on each of these points. First, the undisputed evidence established that the roads were not deserted at the time of the accident. If they had been deserted, this case would never have arisen. The fact is that at least three vehicles were in relatively close proximity at the intersection of the two roads at the time of the accident.

Second, there is no testimony in the record to suggest that Pojar "unintentionally ran a red light." Pojar and his witnesses maintained unequivocally that he had a green light when he entered the intersection. There was no testimony or evidence offered to show that Pojar ran the red light "unintentionally." The evidence offered by Cifre and McCormick tended to show that Pojar ran a red light, but there was no testimony as to whether he did so intentionally or unintentionally.

Third, the testimony does not, as Pojar argues, support only the conclusion that he was a safe driver. At best, the evidence was mixed on this issue. Running red lights, whether intentionally or unintentionally, is hardly safe driving, nor is operating a motor vehicle after using marijuana. Although Pojar denied using marijuana on the night of the accident, he did admit that, on previous occasions, he had driven his car immediately after smoking marijuana. He also testified, "I believe it's wrong to smoke marijuana and then get in a car and drive it if you're high...." Given the foregoing testimony by Pojar, we will not address counsel's suggestion that some marijuana use—a "little buzz"—is reasonable while operating a motor vehicle.

Having reviewed the entire record, we conclude that there is legally and factually sufficient evidence to support the jury's finding that the combination of Pojar's acts (namely, using marijuana, driving a vehicle after using marijuana, and running a red light) involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and that Pojar had actual subjective awareness of the risk involved but nevertheless proceeded in conscious indifference to the rights, safety, or welfare of others. Whether viewed in the light most favorable to the verdict or in a neutral light, there is sufficient evidence for a reasonable trier of fact to have formed a firm belief or conviction that the finding of malice was true.

Pojar's fourth issue is overruled.

## VI. Conclusion

We have overruled all issues other than Pojar's third issue, which asked this Court

to "render a new judgment that disregards the jury's response to that question [about loss of past services]." We grant the relief requested. The portion of the judgment awarding $200,000 for loss of past services is reversed and a judgment is rendered awarding zero damages for loss of past services. The judgment is otherwise affirmed.

Dissenting Opinion by Justice HINOJOSA.

HINOJOSA, Justice, dissenting.

I respectfully dissent. I disagree with the majority's holding that appellant, Scott Michael Pojar, failed to preserve any issue regarding the equalization of peremptory challenges and, if the issue was preserved, the trial court did not abuse its discretion in the allocation of peremptory challenges.

### A. Issue Preservation

The majority does not dispute the timeliness of Pojar's objection to the allocation of peremptory challenges. Rather the majority relies on the requirement set forth in rule 33.1 of the Texas Rules of Appellate Procedure that the grounds be made with "sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context" in determining that Pojar failed to preserve any issue regarding equalization of peremptory challenges. *See* Tex. R.App. P. 33.1. Although Pojar filed a "Motion for Equalization of Peremptory Strikes," the majority concludes that because Pojar requested an equal number of strikes as the plaintiff and co-defendant combined, he actually requested a realignment of sides rather than equalization of peremptory challenges, thereby raising a different issue on appeal than what was argued to the trial court. I disagree.

The paragraph entitled "Motion to Equalize" of rule 233 of the Texas Rules of Civil Procedure provides:

In multiple party cases, upon motion of any litigant made prior to the exercise of peremptory challenges, it shall be the duty of the trial judge to equalize the number of peremptory challenges so that no litigant or side is given unfair advantage as a result of the alignment of the litigants and the award of peremptory challenges to each litigant or side. In determining how the challenges should be allocated the court shall consider any matter brought to the attention of the trial judge concerning the ends of justice and the elimination of an unfair advantage.

Tex.R. Civ. P. 233.

Pojar's "Motion for Equalization of Peremptory Strikes" specifically states as follows:

### I.

Defendants move for equalization of peremptory strikes in accordance with Texas Rule of Civil Procedure 233. Equalization is appropriate in this case to prevent the Plaintiff from obtaining an unfair advantage in jury selection. It is clear from the conduct of the parties that no antagonism exists between the Plaintiffs and the Defendant LAURA McCORMICK. Accordingly, equalization is appropriate to prevent the Plaintiffs and McCORMICK, antagonistic only on matters of damages, but united in opposition to the POJAR Defendants, from having the ability to select the jury.

### II.

It is clear from the conduct of the parties that the Plaintiffs and McCORMICK are united in their goal of estab-

lishing liability solely upon the POJAR's [sic]. Plaintiffs' counsel opposed the admissibility of evidence that LAURA McCORMICK smelled of alcohol following the accident. Plaintiffs' expert has concluded that SCOTT POJAR was solely responsible for the accident. Not surprisingly, McCORMICK's expert holds similar opinions. It is obvious that there is a common interest between the Plaintiffs and Defendant McCORMICK. The reason for the alignment of these parties is obvious: McCORMICK has minimal insurance coverage. Thus, this alignment is not based on what the facts have revealed, but who has the deeper pockets.

### III.

The equalization of peremptory challenges is to be done to meet the ends of justice and to eliminate an unfair advantage. Tex.R.Civ.P. 233. The basis for equalization can be made from a determination of the interests of the parties disclosed through pretrial proceedings or other information specifically called to the attention of the court. *Perkins v. Freeman,* 518 S.W.2d 532, 534 (Tex. 1974). As mentioned above, the common themes and goals between the Plaintiffs and McCORMICK have been demonstrated by their counsel throughout discovery and during pretrial matters.

### IV.

The Court recently ruled that the Plaintiffs would receive six peremptory challenges; and that each Defendant would receive three peremptory challenges. The realistic result will be that the Plaintiffs and McCORMICK will have access to nine peremptory strikes as opposed to three for the POJAR's [sic]. Many cases have held such a situation to constitute reversible error. *Tamburello v. Welch,* 392 S.W.2d 114 (Tex.1965); *Council v. Bankers Commercial Life Ins. Co.,* 558 S.W.2d 487, 489 (Tex.App.-Beaumont 1977, writ ref'd n.r.e.); and *Diamond Shamrock Corp. v. Wendt,* 718 S.W.2d 766, 770 (Tex.App.-Corpus Christi 1986, writ ref'd n.r.e.). Those cases demonstrate the need for equalization of peremptory strikes in situations such as the one present in this case.

### V.

The POJAR's [sic] request that the Court grant them an equal amount of peremptory strikes as those to be exercised by the Plaintiffs and McCORMICK, combined. For illustration, the court in *Williams v. Texas City Refining, Inc.,* 617 S.W.2d 823 (Tex.App.-Houston [14th Dist.]1981, writ ref'd n.r.e.), granted a plaintiff six strikes, the target defendant seven strikes, and a third-party defendant closely aligned with the plaintiff one strike. Accordingly, the POJAR's [sic] request a similar allotment in this case to meet the ends of justice.

WHEREFORE, PREMISES CONSIDERED, the POJAR's [sic] pray that their Motion for Equalization of Peremptory Strikes be GRANTED; that the POJAR's [sic] receive an allotment of peremptory strikes equal to those of the Plaintiffs and McCORMICK, combined; and for such other relief to which the POJAR's [sic] may show themselves to be justly entitled.

Pojar specifically asked the trial court to "equalize" the peremptory challenges, explaining that, if there was not an equalization, he would be at an unfair disadvantage. Furthermore, he specifically tracked the language of the pertinent paragraph of rule 233 pertaining to equalization, and he cited several cases that con-

sidered the issue of equalization. Also, during arguments to the trial court on the motion both before and after voir dire examination, Pojar and the trial court made references to the equalization of peremptory challenges, both specifically and generally.

Because I conclude that Pojar presented his objection to the allocation of peremptory strikes with sufficient specificity to make the trial court aware of his complaint, I would hold that Pojar's issue regarding the equalization of peremptory challenges was properly before this Court. *See* Tex.R.App. P. 33.1.

### B. EQUALIZATION OF PEREMPTORY CHALLENGES

The threshold question to be answered in allocating strikes when multiple litigants are involved on one side of a lawsuit is whether any of those litigants on the same side are antagonistic with respect to a question that the jury will decide. *Patterson Dental Co. v. Dunn,* 592 S.W.2d 914, 918 (Tex.1979). If, after aligning the parties, the court determines that antagonism exists between parties on the same side, the court must adjust the number of peremptory challenges awarded to each litigant or side so that no litigant or side is given unfair advantage. *See* Tex.R. Civ. P. 233; *King v. Maldonado,* 552 S.W.2d 940, 943–45 (Tex.App.-Corpus Christi 1977, writ ref'd n.r.e). When antagonistic parties on the same side are required to share six strikes, it is error amounting to a violation of the basic right to trial by jury. *Dunn,* 592 S.W.2d at 918.

The majority concludes that by acknowledging that the attorneys for Cifre and McCormick were "acting chummy," the trial court found that Pojar and McCormick were antagonistic toward one another, and, in an effort to remedy this antagonism, the trial court properly allocated peremptory challenges by giving six challenges to Cifre, three to Pojar, and three to McCormick. However, the record shows that the trial court refused to find antagonism, and because there was no finding of antagonism, the trial court did not appropriately adjust the peremptory challenges.

Prior to voir dire examination, counsel for Pojar informed the trial court that the issue of antagonism between the defendants and allocation of peremptory challenges needed to be addressed prior to the exercise of peremptory challenges. Counsel stated that he had good case law to support his position that equalization was required. The trial court responded, ". . . it is clear they [Cifre and McCormick] are not mad at each other, but what do we have that's objective. . . . If your client [Pojar] is a target only because there might be more money available, I don't think that's a way to allocate, you know—if there is no deal that's been made between them then I think my hands are tied."

Following voir dire examination and prior to the exercise of peremptory challenges, the issue of antagonism and equalization was addressed. The trial court asked counsel for Pojar if, in the absence of any kind of deal between Cifre and McCormick, she was supposed to decide they were "chummy." When asked by the trial court if there was case law that ever placed a defendant with the plaintiffs in the absence of a signed agreement, counsel for Pojar referred to several cases including *Diamond Shamrock Corp. v. Wendt,* 718 S.W.2d 766 (Tex.App.-Corpus Christi 1986, writ ref'd n.r.e). The trial court then stated, "I will take judicial notice they are acting chummy, but I don't think that gets us there. I don't think that's the law."

I conclude the trial court erroneously believed that absent a signed agreement or settlement between Cifre and McCormick,

she could not find antagonism and equalize peremptory challenges. In *Wendt*, we found antagonism existed between the defendants, although there was no settlement or signed agreement, and held that the trial court erred in failing to properly allocate the peremptory challenges. *Id.* at 769–70. Because the trial court concluded her "hands were tied," she declined to find antagonism between Pojar and McCormick and denied Pojar's motion for equalization. By denying Pojar's motion, the trial court required Pojar and McCormick, antagonistic defendants on the same side of the docket, to share six challenges, which constitutes error amounting to a violation of the basic right to trial by jury. *See Dunn,* 592 S.W.2d at 918.

Once it is determined that the trial court committed error in allocating peremptory challenges, the next step is to determine if the error resulted in a trial that was materially unfair, thus requiring reversal. *Lopez v. Foremost Paving, Inc.,* 709 S.W.2d 643, 644 (Tex.1986); *Garcia v. Central Power & Light Co.,* 704 S.W.2d 734, 737 (Tex.1986); *Dunn,* 592 S.W.2d at 920. Whether any such error resulted in a materially unfair trial must be decided from an examination of the entire record. *Lopez,* 709 S.W.2d at 644; *Garcia,* 704 S.W.2d at 737; *Dunn,* 592 S.W.2d at 920. When the trial is hotly contested and the evidence sharply conflicting, the error results in a materially unfair trial without showing more. *Lopez,* 709 S.W.2d at 644; *Garcia,* 704 S.W.2d at 737; *Dunn,* 592 S.W.2d at 920.

Cifre has not denied that the trial in this matter was hotly contested. In fact, during his opening statement at trial, Cifre's attorney explained that "a lot of evidence ... is hotly contested." The parties disagreed over almost every piece of evidence relevant to liability, including which defendant had the green light when entering the intersection; a disinterested witness's testimony regarding where McCormick passed him the night of the accident and whether he was a reliable judge of distance; and evidence of drug and alcohol usage, which the trial court itself described as "hotly contested." The final jury verdict of ten-to-two is further evidence of a hotly contested trial. *See Garcia,* 704 S.W.2d at 737; *Dunn,* 592 S.W.2d at 921; *Van Allen v. Blackledge,* 35 S.W.3d 61, 66 (Tex.App.-Houston [14th Dist.] 2000, pet. denied).

After reviewing the record in its entirety, I conclude that this was a hotly contested trial with sharply conflicting evidence, and the trial court's error in denying Pojar's motion to equalize peremptory challenges resulted in a materially unfair trial. I would (1) sustain Pojar's first issue, (2) reverse the judgment of the trial court, and (3) remand the case to the trial court for a new trial. Therefore, I respectfully dissent.